**PRC KENTRON, INC., Appellant,**

v.

**FIRST CITY CENTER
ASSOCIATES, II, Appellee.**

No. 05–86–01290–CV.

Court of Appeals of Texas,
Dallas.

Nov. 30, 1988.

Rehearing Denied Jan. 5, 1989.

Ann Robins, Royal H. Brin, Dallas, for appellant.

Dan S. Boyd, Robert R. Gibbons, Dallas, for appellee.

Before WHITHAM, HECHT and THOMAS, JJ.

HECHT, Justice.

Appellee First City Center Associates II ("Landlord") sued appellant PRC Kentron, Inc. ("Tenant") for breach of a commercial lease and, after trial before the court, obtained a judgment for $2,914,863, offset by $19,535 awarded Tenant on its counter-claim for conversion, plus attorney fees, interest and costs. We hold that:

—The trial court did not err in finding that Tenant breached the lease by deserting and vacating a substantial portion of the premises;

—The trial court correctly concluded that Landlord was not required to comply with Texas Property Code section 91.002 in locking Tenant out of the premises after Tenant breached the lease because that statute does not apply to commercial leases;

—The trial court did not err in calculating Landlord's future damages using the fair market value of the lease for the balance of its term determined as of the time of trial rather than the time of Tenant's breach; and

—The trial court did not commit reversible error in including in Landlord's past damages, rather than its future damages, unpaid rent after termination of the lease.

Accordingly, we affirm the judgment of the trial court.

I

Landlord's and Tenant's respective predecessors signed a ten-year lease dated August 11, 1983, for nearly an entire floor in a major downtown Dallas office building to be used as Tenant's headquarters. Under a separate letter agreement Tenant's rent payments were reduced as long as it was not in breach of the lease. Under the lease, Tenant defaulted if it "desert[ed] or vacate[d] any substantial portion of the Premises".

In the spring of 1985, only about a year after Tenant took possession of the premises, it decided to move its headquarters out of the state. Tenant attempted without success to negotiate with Landlord for a buy-out of the remainder of the lease, and hired a broker to search for a suitable subtenant. Meanwhile, Tenant began to move equipment and personnel out of the premises, although it continued to pay rent and professed an intention to do so until it found a satisfactory use for the premises or someone to assume its obligations under the lease. By late July 1985, no personnel, no working files, and no more than half the furnishings remained on the premises.

Tenant paid the August rent by check dated July 31, 1985. By letter dated the next day, August 1, 1985, Landlord advised Tenant that it was in default of the lease by having deserted or vacated a substantial portion of the premises. Tenant did not respond to this letter. Landlord sent Tenant two other letters, both dated August 20, 1985. One advised Tenant that the rent reduction letter agreement was terminated and demanded payment of the increased rent for August. The other notified Tenant that Landlord was "entering upon and taking possession of the Premises without terminating this Lease", and would the same day change the locks and deny Tenant entry to the premises. Landlord did exactly as it promised.

By letter dated August 30, 1985, Tenant's attorney advised Landlord that its entry into and exclusion of Tenant from the

premises violated Texas Property Code section 91.002 and that Tenant was consequently terminating the lease. Tenant did not pay the increased rent Landlord demanded for August, and, in fact, paid no rent after its July 31 check.

Landlord sued Tenant for breach of the lease. Tenant counterclaimed for conversion of its property from the leased premises after it was locked out. Following a five-day nonjury trial, the trial court found that:

—Tenant breached the lease by substantially vacating and abandoning the premises and by failing to pay rent and perform its other obligations under the lease;

—Texas Property Code section 91.002 does not apply to commercial leases, and Landlord did not violate that section; and

—Landlord converted furniture and equipment belonging to Tenant worth $3,907.

The trial court awarded Landlord damages for Tenant's breach of lease, including rent arrearages and future damages, less actual and exemplary damages for Landlord's conversion of Tenant's property. The trial court also awarded Landlord reasonable attorney fees for prosecution of its claim, partly offset by reasonable attorney fees for Tenant's prosecution of its counterclaim, plus attorney fees on appeal, interest and costs.

## II

Tenant's first three points of error question whether Landlord had the right to reenter the premises when it did, and whether it violated any statutory restrictions upon that right. If Tenant did not breach the lease by moving out of the premises to the extent it did, then Landlord had no right to reenter and exclude Tenant from the premises, and Tenant was justified in terminating the lease in August 1985. If, on the other hand, Tenant did breach the lease by moving out, Landlord had the right under the lease and the common law to reenter the premises. *See Gulf Oil Corp. v. Smithey*, 426 S.W.2d 262 (Tex. Civ.App.—Dallas 1968, writ dism'd); *Embry v. Bel–Aire Corp.*, 508 S.W.2d 469 (Tex.Civ.App.—Austin 1974, writ ref'd n.r. e.). In the latter instance, the only remaining issue is whether Landlord violated Texas Property Code section 91.002 in excluding Tenant from the premises. Accordingly, we turn first to the question of whether Tenant breached the lease by moving out.

## A

The trial court found that Tenant "substantially vacated and abandoned the Premises" in breach of the lease. Tenant complains in its third point of error that the evidence is insufficient to support this finding.[1]

Tenant argues that to abandon premises a tenant must intend to forsake them altogether. Merely ceasing to use the premises, Tenant contends, is not sufficient to show abandonment unless such non-use is prolonged and unexplained. *See City of Anson v. Arnett*, 250 S.W.2d 450, 454 (Tex. Civ.App.—Eastland 1962, writ ref'd n.r.e.); *Pearson v. Black*, 120 S.W.2d 1075 (Tex. Civ.App.—Eastland 1938, no writ). Moreover, leaving does not constitute abandonment of the lease, Tenant says, as long as the tenant continues to pay rent. *See M.L. C. Loan Corp. v. P.K. Foods, Inc.*, 541 S.W.2d 902 (Tex.Civ.App.—Beaumont 1976, no writ); *Lucky v. Fidelity Union Life Ins. Co.*, 339 S.W.2d 956, 959 (Tex.Civ.App. —Dallas 1960, no writ). Tenant contends that there is no evidence, or at least insufficient evidence, that it ever intended to forsake altogether the premises and its lease obligations. On the contrary, Tenant asserts, the evidence is undisputed that it was continuing to honor its lease obli-

---

**1.** Tenant's third point of error states only: "The trial court erred in finding that Appellant breached the lease agreement." Landlord contends that this point is essentially unargued in Tenant's original brief. Although Tenant appears to address the point in only one paragraph of its original brief, we are able to determine its basic contention sufficiently to permit full consideration of the arguments contained in Tenant's reply brief, which is mostly devoted to this point, and its post-submission briefs.

gations by paying rent when due, and that it intended within a reasonably short time either to sublet the premises or to restaff its offices there.

Landlord challenges, although not very vigorously, whether abandonment requires an intention to forsake. Even if it does, Landlord contends, somewhat more forcefully, that the trial court could have inferred from evidence of all the circumstances that despite Tenant's protestations to the contrary at trial, when Tenant moved out of the premises in July 1985 it intended to forsake them permanently. Most cogently, Landlord argues that "vacation" and "desertion", the terms used in the lease, do not involve any intention to forsake denoted by "abandonment", and that the evidence is sufficient, without showing that Tenant intended to forsake the premises permanently, to establish that it vacated the premises in breach of the lease.

In rebuttal, Tenant contends that whatever meaning the words "vacate" and "desert" may have ordinarily, the parties to the lease in this case intended them to be synonymous with abandon and to import an intentional forsaking rather than merely a temporary moving out. Tenant argues that its right to sublease the premises necessarily contemplates at least a temporary moving out to allow a subtenant to move in. Moreover, Tenant argues, Landlord was aware of its changed circumstances and even assisted Tenant in moving out, never warning that it considered Tenant might be vacating the premises in breach of the lease until the letter dated August 1, 1985.

Landlord denies that it meant by using "desert" and "vacate" in the lease that Tenant would *not* be in default so long as it intended not to forsake the premises permanently. To the contrary, Landlord contends that it purposed by those words not to require any such intent in order to protect its interests fully. An office building, according to Landlord, is not designed for use as a warehouse and must be occupied to be attractive. Consequently, Landlord continues, a lessor of space in an office building may require, just as it has done in this case, that the premises actually be occupied, irrespective of a tenant's intent as to future use. Moreover, Landlord argues, that Tenant's right to sublease the premises does not necessarily confer any right to vacate them even temporarily because that right is conditioned upon Landlord's consent, which was never requested or given in this case. Further, Landlord argues that the evidence as to how much it knew of Tenant's circumstances is very much in dispute, and that any assistance it gave Tenant did not, either under the lease or otherwise, estop it from complaining of Tenant's breach.

We agree with Landlord that in ordinary parlance, "abandon" includes an element of intent present only to a lesser extent in the meaning of "desert" and completely absent from the meaning of "vacate". Webster's Third New International Dictionary of the English Language (Unabridged) (1981) gives the principal meaning of "abandon" as "to cease to assert or exercise an interest, right, or title to esp. with the intent of never again resuming or reasserting it; ... to forsake or desert". The same dictionary defines "desert" as "to withdraw from or leave permanently or less often temporarily", and lists "abandon" as a synonym. However, "vacate", again according to the same authority, means simply "to make vacant", and "vacant", in turn, means "being without content or occupant". Thus, the ordinary meanings of "abandon" and "vacate" are different, and the latter does not require an intent to forsake.

Tenant cites several cases to the effect that premises are not vacant for insurance purposes as long as substantial personalty is left there, even if all people have left. The language in two of these cases tends to equate "vacant" with "abandoned". *See Phoenix Assur. Co. v. Shepherd,* 134 Tex. 669, 137 S.W.2d 996 (1940); *Knoff v. United States Fidelity & Guaranty Co.,* 447 S.W.2d 497 (Tex.Civ.App.—Houston [1st Dist.] 1969, no writ). Whatever validity such language may have in the insurance context, it does not blur the distinction drawn in the instant case.

■ The lease in this case provides that Tenant defaults if it "deserts or vacates any substantial portion of the Premises". No party has suggested that this provision is ambiguous, and we do not find it so. Using the ordinary meanings of the words, we conclude that the lease clearly provides that Tenant is in default if it moves out, regardless of how long it is gone, whether it intends to return, and whether it pays rent in the meantime. Inasmuch as we conclude that the provision is unambiguous, we need not consider Tenant's arguments as to the intent of the parties. We note, nonetheless, that we are not persuaded by those arguments. Landlord's right to consent to any sublease is some evidence that the parties intended that Tenant's moving out without Landlord's consent would be in breach of the lease. Any evidence that Landlord had knowledge of Tenant's plans and assisted in carrying them out does not conclusively establish that Landlord is estopped to claim that Tenant breached the lease. At most, such evidence merely raises an issue of fact which the trial court resolved against Tenant.

■ Tenant also complains that the trial court found that it "substantially vacated" the premises, not that it "vacate[d] a substantial portion of the Premises" as provided in the lease. Tenant insists that the two are not the same. Even if there is sufficient evidence for the trial court to find that Tenant substantially vacated the premises, there is still no evidence, Tenant argues, that it vacated any specific, let alone substantial, portion of the premises. We are not persuaded by this argument. It can hardly be seriously suggested that Tenant could have avoided breaching the lease simply by spreading out a few of its things over a broad, otherwise empty and unmanned space. Tenant's departure from the premises was substantial, even though some items of its property remained.

■ We conclude that there is not only some but sufficient evidence for the trial court to find that Tenant breached the lease by vacating the premises. Accordingly, we overrule Tenant's third point of error.

## B

■ Even if Tenant breached the lease by vacating the premises, Tenant contends in its first point of error that Landlord could not reenter the premises and exclude Tenant without complying with section 91.002 of the Texas Property Code. In its second point of error Tenant complains that the evidence is legally and factually insufficient for the trial to conclude that Landlord did comply with the statute. Before turning to the various arguments of the parties, it is necessary that we examine section 91.002 and its derivation from former article 5236c, Tex.Rev.Civ.Stat.Ann. (Act effective Sept. 1, 1973, ch. 441, § 2, 1973 Tex. Laws 1226).

Section 91.002 states:

Interruption of Utilities and Exclusion of Tenant

(a) A landlord may not interrupt or cause the interruption of utility service paid for directly to the utility company by a tenant unless the interruption results from bona fide repairs, construction, or an emergency.

(b) A landlord may not intentionally prevent a tenant from entering the leased premises except by judicial process unless the exclusion results from:

(1) bona fide repairs, construction, or an emergency;

(2) removing the contents of premises abandoned by a tenant; or

(3) changing the door locks of a tenant who is delinquent in paying at least part of the rent.

(c) If a landlord changes the door lock of a tenant who is delinquent in paying rent, the landlord must:

(1) place a written notice on the tenant's front door stating the name and location of the individual from whom the new key may be obtained; and

(2) provide the new key to the tenant at any hour, regardless of whether or not the tenant pays any of the delinquent rent.

(d) The tenant of a landlord who violates this section may:

(1) either recover possession of the premises or terminate the lease; and

(2) recover an amount equal to the sum of his actual damages, one month's rent, and reasonable attorney's fees, less any delinquent rents or other sums for which the tenant is liable.

(e) A provision of a lease that purports to waive a right or to exempt a party from liability or duty under this section is void.

Neither section 91.002 nor its predecessor, article 5236c, is or was by its own language expressly limited to residential tenancies.[2] However, article 5236c was enacted by chapter 441 of the 1973 session laws, the preamble to which describes it as:

An Act for service of process on agents of a residential landlord under certain circumstances; relating to the willful interruption of utility services by a residential landlord; relating to the willful exclusion of a tenant by a residential landlord; relating to residential landlord liens; repealing all laws in conflict and specifically Article 5238a, Vernon's Texas Civil Statutes; adding Articles 5236b, 5236c, and 5236d, Vernon's Texas Civil

Statutes; declaring an effective date; and providing a savings clause.

Sections 1 and 3 of chapter 441 added new articles 5236b and 5236d, respectively, which, by their express language, did apply only to residential tenancies. *See Charalambous v. Jean Lafitte Corp.*, 652 S.W. 2d 521 (Tex.App.—El Paso 1983, writ ref'd n.r.e.). Sandwiched between these two provisions, section 2 added article 5236c. Section 4 of chapter 441 stated:

This Act shall take effect on September 1, 1973, and shall apply to all residential rental agreements, written or oral, executed or entered into after such date.

In 1983 articles 5236b–5236d were moved to the Texas Property Code, which the Legislature enacted for the purpose explained in section 1.001(a) as follows:

This code is enacted as part of the state's continuing statutory revision program begun by the Texas Legislative Council in 1963 as directed by the legislature in Chapter 448, Acts of the 58th Legislature, Regular Session, 1963 (Article 5429b–1, Vernon's Texas Civil Statutes). The program contemplates a topic-by-topic revision of the state's general

2. Article 5236c stated:

Willful Interruption of Utilities and Willful Exclusion by Landlord

Section 1. It shall be unlawful under any circumstances for a landlord or his agent to interrupt or cause interruption of utilities paid for by the tenant directly to the utility company.

Sec. 2. It shall be unlawful for a landlord or his agent to willfully exclude a tenant from the tenant's premises in any manner except by judicial process. Willful exclusion shall mean preventing the tenant from entering into the premises with intent to deprive the tenant of such entry. Provided, however, a landlord or his agent shall not be prevented from removing the contents of the premises when the tenant has abandoned the premises or from changing door locks when the tenant's rentals are in fact delinquent in whole or in part. When such door lock is changed under such circumstances, a written notice shall be left on the tenant's front door describing where the new key may be obtained at any hour and describing the name of the individual who will provide the tenant with such key; and such key shall be provided regardless of

whether the tenant pays any delinquent rentals.

Sec. 3. The landlord or his agent shall not be guilty of a violation of this Article if the action complained of resulted from bona fide repairs, construction, or emergencies.

Sec. 4. Upon violation of this Article by the landlord or his agent, the tenant may recover possession or terminate the rental agreement; and, in either case, the tenant may recover actual damages, plus one month's rent, plus reasonable attorneys fees, less any delinquent rentals or other sums for which the tenant is liable.

Sec. 5. Any provision of an oral or written rental agreement between the landlord and tenant which provision purports to exempt the landlord or tenant from any liability or duty imposed herein or which provision purports to waive the rights and liabilities granted under this Article, shall be void and unenforceable.

Sec. 6. Nothing in this Article shall serve to affect or diminish any of the rights of the landlord or tenant under contract, statute, or common law which are consistent with the provisions hereof.

and permanent statute law without substantive change.

The statute referred to, former article 5429b–1, itself now similarly recodified as section 323.007 of the Texas Government Code, prescribes:

When revising a statute the council may not alter the sense, meaning, or effect of the statute.

Confirming its intention that this mandate be complied with, the Legislature in enacting the Property Code stated:

NONSUBSTANTIVE REVISION. This Act is intended as a recodification only, and no substantive change in the law is intended by this Act.

Act effective January 1, 1984, ch. 576, § 7, 1983 Laws 3475, 3730. In the new Property Code, former article 5236b was recodified as section 92.003 in chapter 92, entitled "Residential Tenancies". Former article 5236d was recodified as sections 54.-041–.045 in chapter 54, subchapter C, entitled "Residential Landlord's Lien". Former article 5236c, however, was recodified in chapter 91 of the Property Code entitled "Provisions Generally Applicable to Landlords and Tenants".

Tenant contends that section 91.002 applies to commercial leases and that the trial court erred in concluding that it does not. Tenant argues that neither the heading nor the contents of chapter 91 of the Property Code in general, or section 91.002 in particular, suggests that that section applies only to residential tenancies. By contrast, Tenant argues, both the headings and the contents of chapters 54 and 92 in general, and section 54.041–.045 and 92.003 in particular, expressly limit those provisions to residential tenancies. As for article 5236c, Tenant points out that its language, like that of section 91.002, was not limited to residential tenancies.[3] Citing a multitude of authorities, Tenant insists that the preamble and other sections of the enact-

ment of article 5236c are "without enacting force" and cannot be read to restrict the language of the statute.

Tenant's argument is contradicted by the legislatively prescribed principles of statutory construction referenced in the Property Code itself. Section 1.002 of the Property Code states:

The Code Construction Act (Article 5429b–2, Vernon's Texas Civil Statutes) applies to the construction of each provision in this code, except as otherwise expressly provided by this code.

Sections 311.023 and 311.024 of the Government Code, a portion of the recodification of former article 5429b–2, state:

§ 311.023. Statute Construction Aids

In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the:

(1) object sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including laws on the same or similar subjects;

(5) consequences of a particular construction;

(6) administrative construction of the statute; and

(7) title (caption), preamble, and emergency provision.

§ 311.024. Headings

The heading of a title, subtitle, chapter, subchapter, or section does not limit or expand the meaning of a statute.

Applying these principles, it is absolutely clear that article 5236c did not apply to commercial tenancies. The preamble, effective date provision, and related statutory provisions of the Act which made article 5236c law cannot, under the principles set forth in section 311.023 above, be dis-

---

**3.** Tenant suggests that Attorney General Opinion No. H–377 (1974) construes article 5236c to apply to commercial tenancies, quoting from that opinion: "the plain language of Art. 5236c must be interpreted to deal with all landlord-tenant relationships." The issue addressed by that opinion was whether article 5236c applied to short term or weekly tenancies. By "all landlord-tenant relationships", the opinion clearly meant both short-term and long-term. The opinion cannot conceivably be read to construe article 5236c applicable to commercial leases, and Tenant's suggestion to the contrary is very misleading.

regarded and compel the conclusion that that article was not intended by the Legislature to apply to commercial tenancies. The Legislature expressly disavowed any intention of substantively changing article 5236c in recodifying it as section 91.002 of the Property Code.[4] So clear a statement of legislative intent cannot be ignored. *See Lower Colorado River Auth. v. Texas Dep't of Water Resources,* 689 S.W.2d 873 (Tex.1984); *Bryant v. Metropolitan Transit Auth.,* 722 S.W.2d 738 (Tex.App.— Houston [14th Dist.] 1986, no writ). Under section 311.024 above, the placement of section 91.002 in a chapter not limited by its heading to residential tenancies is inconsequential.[5]

We do not hold that every recodified statute can never be more or less than its predecessor, or that the construction of the former provision always controls the latter. *See Gulf, C. & S.F. Ry. v. Gardner,* 266 S.W. 809 (Tex.Civ.App.—Austin 1924, no writ); *Waters v. Gunn,* 218 S.W.2d 235 (Tex.Civ.App.—Amarillo 1949, writ ref'd n.r.e.). We acknowledge, as Tenant reminds us, that the ordinary citizen ought to be able to determine his rights and responsibilities under a statute from the text itself without resort to the much less readily accessible session laws. *See American Indemnity Co. v. City of Austin,* 246 S.W. 1019 (Tex.1922). Here, however, the Legislature has not only restricted the authority of the revision council to making nonsubstantive changes but has also expressly stated that it, the Legislature, intended in enacting the recodification no substantive change in the law. Moreover, the Property Code itself warns that its provisions are to be construed according to specified principles. To read section 91.002 to apply to commercial leases would not only ignore those principles but contradict the entire context of its original enactment.

Accordingly, we hold that section 91.002 of the Texas Property Code does not apply to commercial leases like the one in this case. In so doing we agree with the reasoning and conclusions of the only other court that has addressed this issue. *Design Center Venture v. Overseas Multi-Projects Corp.,* 748 S.W.2d 469 (Tex.App.— Houston [1st Dist.] 1988, writ denied). Tenant's first point of error is overruled. In view of this holding, we need not address Tenant's second point of error.[6]

### III

In its four remaining points of error Tenant raises two complaints as to the trial court's calculation of Landlord's damages. First, Tenant complains that the trial court erred in computing Landlord's future damages using a fair market value of the remainder of the lease term determined as of the date of trial rather than the date of Tenant's breach. Tenant contends that because there is no evidence of the value of the remainder of the lease term as of the date of its breach, there is no evidence to support the award of damages to Landlord, and the judgment must be reversed and the case remanded. Second, Tenant complains that the trial court erred in awarding Landlord accrued rent after the date Landlord terminated the lease. Tenant contends that the judgment should be reduced by the amount of this erroneous award. Before addressing each of Tenant's complaints in turn, we first set out the factual and legal contexts in which they arise.

4. Tenant argues that even if article 5236c was limited to residential tenancies, the revisor's note following section 91.004 of the Property Code shows that the recodification of article 5236c enlarged its meaning. The simple answer to this argument is that the revisor's note does not refer, either directly or indirectly, to article 5236c.

5. Tenant argues that if the Legislature had wanted to restrict section 91.002 to residential tenancies it could have amended that section since its enactment in 1983. Of course, having concluded that section 91.002 is already so restricted, we would not expect the Legislature to amend that statute to do what it has already done.

6. We also do not address Landlord's argument that section 91.002 does not apply when leased premises have been abandoned. Having concluded that Tenant vacated the premises in breach of the lease, we have not attempted to determine whether the evidence is sufficient to support the trial court's finding that Tenant abandoned the premises.

**A**

Landlord sued Tenant on January 31, 1986, for breaching the lease in July and August 1985. Trial before the court commenced July 23, 1986. During the testimony of the first witness, the trial court indicated its view that Landlord was not entitled to recover future damages under the lease if the lease had not been terminated. The trial court appears to have based its view upon the provisions of the lease specifying Landlord's remedies for Tenant's breach, which state:

*Section 24.02.* If an event of default occurs and at any time thereafter while Tenant remains in default, Landlord may do any one or more of the following without any notice or demand:

(a) Terminate this lease, in which event Tenant shall immediately surrender the Premises to Landlord. If Tenant fails to do so, Landlord may, without notice and without prejudice to any other remedy Landlord may have, enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor; and Tenant shall indemnify Landlord for all loss and damage which Landlord may suffer by reason of such termination, whether through inability to relet the Premises or otherwise, including any loss of Rental for the remainder of the Term.

(b) Terminate this lease, in which event Tenant's event of default should be considered a total breach of Tenant's obligations under this lease and Tenant immediately shall become liable for such damages for such breach amount, equal to the total of (1) the costs of recovering the Premises; (2) the unpaid Rental earned as of the date of termination, plus interest thereon at a rate per annum from the due date equal to five percent (5%) over the Prime Rate; provided, however, that such interest shall never exceed the Highest Lawful Rate; (3) the amount of the excess of (i) the total Rental and other benefits which Landlord would have received under this lease for the remainder of the Term, at the rates then in effect, together with all other expenses incurred by Landlord in connection with Tenant's default, over (ii) the Fair Market Value Rate of the balance of the Term as of the time of such breach, discounted at the rate of eight percent (8%) per annum to the then present value; and (4) all other sums of money and damages owing by Tenant to Landlord.

(c) Enter upon and take possession of the Premises as Tenant's agent without terminating this lease and without being liable to prosecution or any claim for damages therefor, and Landlord may relet the Premises as Tenant's agent and receive the Rental therefor, in which event Tenant shall pay to Landlord on demand the cost of renovating, repairing, and altering the Premises for a new tenant or tenants and any deficiency that may arise by reason of such reletting; provided, however, that Landlord shall have no duty to relet the Premises and Landlord's failure to relet the Premises shall not release or affect Tenant's liability for Rental or for damages.

(d) Do whatever Tenant is obligated to do under this lease and may enter the Premises without being liable to prosecution or any claim for damages therefor, to accomplish this purpose. Tenant shall reimburse Landlord Immediately upon demand for any expenses which Landlord incurs in thus effecting compliance with this lease on Tenant's behalf, and Landlord shall not be liable for any damages suffered by Tenant from such action, whether caused by the negligence of Landlord or otherwise.

*Section 24.03.* No act or thing done by Landlord or its agents during the Term shall constitute an acceptance of an attempted surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by the Landlord. No re-entry or taking possession of the Premises by the Landlord shall constitute an election by Landlord to terminate this lease unless a written notice of such intention is given to Tenant. Notwithstanding any such reletting or

re-entry or taking possession, Landlord may at any time thereafter terminate this lease for a previous uncured default. . . .

*Section 24.04.* . . . The rights granted to Landlord in this lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law or in equity or by statute, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

Inasmuch as Landlord had never notified Tenant in writing of its intention to terminate the lease under section 24.03, the trial court was of the view that Landlord's only basis of recovery was section 24.02(c) of the lease, which, according to the trial court, allowed recovery only of unpaid rent to the time of trial and not any future damages. The trial court rejected Landlord's arguments that section 24.02(c) did allow recovery of future damages, and that, in any event, its common law rights preserved by section 24.04 entitled it to recover such damages. Faced with this view of the trial court as to its position,[7] Landlord requested a postponement of the trial, which the trial court granted. Almost two months later, on September 22, 1986, Landlord gave Tenant written notice that it was terminating the lease effective that date. The following month, October 1986, the case was again called to trial. Judgment was rendered on November 10, 1986.

The trial court awarded Landlord damages calculated as follows:

| | | |
|---|---|---:|
| 1. | Rent arrearages: | |
| | 1.1 Additional rent for 8/85 | $ 7,970 |
| | 1.2 Rent for 9/1/85 through the month of trial (to 10/31/86) plus pre-judgment interest | 737,724 |
| 2. | Future damages: | |
| | 2.1 Present value at time of trial (10/86) of rent for 11/1/86 through 11/30/93 | $3,008,838 |
| | 2.2 Less: Present value at time of trial (10/86) of balance of term of lease | (585,669) |
| 3. | Credit: Parking | (254,000) |
| | Subtotal: Recovery under lease | $2,914,863 |
| 4. | Offsets for counterclaim: | |
| | 4.1 Actual damages | (3,907) |
| | 4.2 Exemplary damages | (15,628) |
| | Total damages | $2,895,328 |

For this computation the trial court appears to have used the formula in section 24.02(b) of the lease, although Landlord argues that the same damages could have been calculated equally under the common law.[8] Tenant's complaints are directed at items 1.2 and 2.2. We address the latter first.

## B

Section 24.02(b)(3) of the lease allows Landlord to recover future damages for Tenant's breach equal to the discounted value of future payments to have been due from Tenant[9] less the discounted value of payments Landlord would be expected to receive from reletting the premises for the remainder of the term. The calculation is reflected in item 2 above, item 2.2 being the deduction for the value of the remainder of the term of the lease. Section 24.02(b)(3)(ii) specifies that the value of the remainder of the lease be determined "as of the time" of Tenant's breach. The trial court based its determination of this value on evidence of office lease market conditions existing not only at the time of the breach but subsequently to the time of trial. That evidence showed a decline in the market conditions between August 1985 and October 1986. Tenant argues that the lease precludes consideration of such deteriorated market con-

---

7. We, of course, express no opinion as to whether this view of the trial court was correct.

8. In view of our conclusion that the trial court's damage award was proper under the lease, we need not address whether Landlord's remedies are as broad under the common law as under the lease agreement. As a rule, a landlord is entitled to the legal remedies provided in the lease. *See Rohrt v. Kelley Manufacturing Co.,* 162 Tex. 534, 349 S.W.2d 95 (1961). That rule applies in this case.

9. We note that although section 24.02(b)(3)(i) of the lease refers to the total benefits to Landlord for the remainder of the term, Landlord does not contest that the proper figure is the present value of those benefits rather than the total.

ditions after the breach. Tenant argues that the value of the remainder of the lease should have been determined under the more favorable market conditions of August 1985, not the less favorable market conditions of October 1986. This error, Tenant complains, resulted in a lower deduction for the value of the remainder of the lease term and consequently higher damages than allowed by the lease.

Tenant's argument characterizes section 24.02(b) with subtle sleight of hand. Tenant reads the lease provision that the value of the remainder of the term after breach be determined *as of the time* of the breach, as a requirement that that value be determined *under the conditions existing at the time* of the breach. The substituted requirement and actual lease provision are not equivalent. Section 24.02(b) does not require that the value of the future term determined as of the time of the breach be based solely upon conditions existing at that time; it does not forbid reasoned prognostication at the time of Tenant's breach as to what the future holds for Landlord. On the contrary, assessment of future damages necessarily requires consideration of what future conditions are likely to be. A very sagacious if not truly vaticinal expert would have accurately foreseen, as of the time of Tenant's breach, market conditions rising or falling over the remainder of the entire term and assigned a value to that remainder equal to what Landlord would actually realize. A value so perfectly predicted as of the time of breach would take into account all existing and future conditions. However doubtful it may be that such future events could be prophesied with precision, the lease does not forbid trying.

We are not persuaded by Tenant's argument. In our view, the provision of section 24.02(b)(3) that the value of the remainder of the lease term be determined as of the time of the breach merely emphasizes that Landlord is not required to wait for the balance of the term to expire to see what value is actually realized but is entitled to have that value assessed for the future. It certainly does not require an expert testifying more than a year after Tenant breached the lease to ignore the events of the interim period and try to imagine how far- or near-sighted he might have been a year before. No matter how bleak Landlord's opportunities to relet the premises may have appeared at the time of Tenant's breach, if, by the time of trial, Landlord had long since relet the premises at substantial profit, Tenant would surely want a corresponding deduction in any future damages to be awarded. By the same token, if Landlord's chances of reletting the premises appeared more remote by the time of trial than might earlier have been predicted, an expert testifying at trial is not required to ignore the facts and limit the basis of his opinion by his former myopia.

We conclude that under the lease, the trial court was permitted, in determining the fair market value of the balance of the term, to consider evidence of market conditions existing not only at the time of Tenant's breach but also subsequently.[10] Only if evidence of conditions subsequent to Tenant's breach is disregarded does Tenant contend that the evidence does not support the trial court's damage award. If, as we hold, such evidence was properly considered, Tenant does not argue that it does not support the verdict. Accordingly, we conclude that the evidence supports the trial court's finding of the fair market value of the remainder of the lease term.

C

[redacted] As shown in item 1.2 of the damage calculations set forth above, the trial court awarded Landlord rent arrearages through October 31, 1986. Section 24.02(b)(2) of the lease entitles Landlord to unpaid rental only "as of the date of termination". Tenant argues that the trial court erred in awarding Landlord more than $56,000 for the 38 days between September 22, 1986,

10. Landlord argues that even if the lease did not allow consideration of evidence subsequent to Tenant's breach in determining the value of the balance of the lease, the common law does. In view of our conclusion that the lease allows consideration of such evidence, we need not address whether the common law does as well.

the date Landlord terminated the lease, and October 31, 1986. Although we agree that the trial court erred, we find the error harmless.

Tenant's argument goes too far. Not only would Tenant deny Landlord, correctly, unpaid rent after the termination date, Tenant argues, incorrectly, that *no* damages for the period between September 22 and October 31, 1986, should be included in any award to Landlord. The trial court's error, however, was not in awarding Landlord damages for that period, but in calculating those damages as rent arrearages rather than as future damages. The proper calculation was to cut off rent arrearages at September 22, and include the $56,000–plus amount for lost rent from that date through October 31 in future damages. This calculation would result in the same damage award if the interest rate for past damages had been the same as the present value discount rate.[11] In this case, it appears from the evidence that the two rates were not the same. The interest rate which Landlord's expert used, and the trial court apparently accepted, in calculating damages for September and October 1986 was 13%, and the present value discount rate was 10%.[12] Had the approximately $56,000 sum of which Tenant complains been included in determining future value rather than rent arrearages, the net difference should have increased Landlord's damage award, very roughly figured, by 3% per annum on about $56,000 for 38 days, on the order of $175.

We reject Tenant's argument that no amount should have been included as damages for the period between September 22 and October 31, 1986. Tenant does not complain specifically of the increase on the order of $175 in the damages calculated. Had it done so, we would consider such

error *de minimis* relative to the total award of over $2.8 million. Accordingly, we conclude that any error in the trial court's calculations was harmless.

### D

Tenant's complaints as to items 1.2 and 2.2 of the trial court's damage calculations set forth above are specified in its sixth and seventh points of error, respectively. Tenant's fourth and fifth points assert, respectively, that the evidence is legally and factually insufficient to support the trial court's damage award, and that the trial court applied an improper measure of damages. Notwithstanding the breadth of these points, the only complaints Tenant actually argues are the two specified in its sixth and seventh points of error. Having concluded that Tenant's specific complaints lack merit, we overrule all four points of error.

### IV

Inasmuch as Tenant has failed to demonstrate reversible error, the judgment of the trial court is AFFIRMED.

---

**11.** Interest is compensation for the use of money. A present value discount is, as it were, reverse-interest: it subtracts from the sum of payments to be received in the future the interest that would be earned on that sum if it were paid in full at present and held until each payment came due. Thus, if the interest rate and the present value discount rate are the same, the present value of a series of periodic payments—past payments with interest and future payments discounted—is the same at any point during the entire period.

**12.** Although section 24.02(b)(3)(ii) of the lease prescribes a present value discount rate of 8%, the expert witness testifying on behalf of the Landlord apparently elected to use a higher, more conservative rate.