**SAUL SUBSIDIARY II LIMITED PARTNERSHIP, Appellant,**

v.

**VENATOR GROUP SPECIALTY, INC., Appellee.**

No. 00–CV–512.

District of Columbia Court of Appeals.

Argued April 3, 2001.
Decided Aug. 21, 2003.

strued that term to mean the tenant's physical act of ceasing operations in the premises *coupled with* the expressed intention by the tenant to discontinue operations. We hold, to the contrary, that the term "vacate" means only the physical act of leaving the premises vacant, and that, regardless of its intentions, Woolworth "vacated" within the meaning of the lease when it ceased doing business, removed its employees and property, and left the premises empty. Our holding requires us to reverse the judgment on appeal and to remand for the trial court to award additional breach of contract damages to Saul. Although Woolworth argues that Saul's claim for those additional damages is barred by accord and satisfaction, the undisputed facts negate that contention.

Thomas D. Renda, Baltimore, MD, for appellant.

John Jay Range, Washington, DC, with whom Lara S. Zick, was on the brief, for appellee.

Before RUIZ, REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

This appeal arises out of a commercial lease dispute between Saul Subsidiary II Limited Partnership ("Saul"), the landlord, and F.W. Woolworth Co. ("Woolworth"), now known as Venator Group Specialty, Inc., the tenant. We are called upon to construe a provision of the lease that obligated Woolworth to pay stipulated rent in the event it vacated the demised premises. The case turns primarily on the meaning of the term "vacate." The trial judge con-

## I.

In 1949, Woolworth entered into a forty-year lease with Saul's predecessor in title for approximately 24,000 square feet of space in a shopping center located at Park Road and 14th Street in Northwest Washington, D.C. The lease was extended in 1989 for an additional ten years, until January 31, 2000. The lease allowed Woolworth to use the demised premises in whatever fashion it chose and to make structural and other alterations as it found "necessary or convenient for its purposes." For nearly fifty years Woolworth elected to operate a general merchandise "Woolworth" store at the Park Road site.

As spelled out in Article 4 of the lease,[1] the rent that Woolworth committed to pay had two components. Pursuant to Article 4(a), Woolworth agreed to a minimum annual rent payable in equal monthly installments. By 1997, this minimum rent had

---

1. The evidence indicates, and Woolworth does not dispute, that the pertinent language of Article 4 was drafted by Woolworth and used routinely in its commercial leases. *See Mercury Inv. Co. v. F.W. Woolworth Co.,* 706 P.2d 523, 527 & 528 n. 4 (Okla.1985).

risen to $77,500.00 per year, or $6,458.33 a month. Pursuant to Article 4(b), Woolworth agreed to pay additional rent for any calendar year in which its sales from the demised premises exceeded $1,291,667, in the amount of six percent of the overage. The parties sometimes referred to this additional rent based on Woolworth's sales volume as "percentage rent." Woolworth further agreed in Article 4(b) that its additional rent obligation would be computed differently if it vacated the premises. In that event Woolworth agreed to pay as additional rent in lieu of percentage rent an annual sum equal to one-third of the total additional rent (if any) that it had paid for the three calendar years immediately preceding the vacating of the premises.[2] The parties referred to this alternative additional rent as "One Third of Three" or "One of Three" rent.

In July of 1997, Woolworth announced that it would shut down its entire chain of general merchandise stores nationwide. Within a few months Woolworth closed its store at Park Road and 14th Street in the District of Columbia, removed its employees, inventory, and trade fixtures, and turned the key over to the landlord. For all intents and purposes the premises were vacant by mid-October, though remaining cleanup and repairs were completed in December. Woolworth delivered a key to the premises to Saul on October 23, 1997 and executed an agreement permitting Saul to enter the premises prior to the termination of the lease. On November 13, 1997, Saul formally notified Woolworth in writing that it had vacated the premises within the meaning of Article 4(b) of the lease and would owe an annual One of Three rent payment of $168,174.64 for the period from January 1, 1997 through January 31, 2000, the end of the lease term.

Woolworth had originally hoped to replace its Park Road general merchandise store by opening a permanent FootLocker[3] store in a portion of the premises. When Woolworth decided to close its general merchandise stores, it identified between 100 and 150 of those stores as candidates for conversion to a FootLocker or other specialty merchandise retail establishment. Woolworth subsequently carried out two types of store conversions. A so-called "permanent conversion" of the sort that Woolworth envisioned for its Park Road store typically involved a substantial investment by Woolworth to renovate and reconfigure the space in order to reopen a brand new specialty merchandise store. In contrast, a "temporary conversion" typically entailed only minimal, cosmetic changes in existing store space to permit it to be used for a relatively brief period as an "outlet" store. Stores identified for temporary conversion commonly

---

2. In pertinent part, the One of Three rent provision in Article 4(b) reads as follows:

Should the Tenant at any time vacate the premises herein demised, or sublet all or any part thereof, as in this Lease elsewhere provided, then and in any such event, anything in this Lease to the contrary notwithstanding, it is hereby mutually agreed that the Tenant shall pay to the Landlord annually during the remainder of the term of this Lease, in addition to the minimum annual rent above set forth, a sum equal to one-third (1/3) of the additional rent (if any) paid by the Tenant to the Landlord pursuant to the provisions of this Article for the three (3) calendar years next preceding the vacating of said premises or the making of such sublease, and shall pay the same in equal monthly installments at the times and in the manner more particularly set forth in Section (a) of this Article. Upon the vacating of said premises or the making of such sublease, all of the covenants and provisions contained in the first four (4) paragraphs of this Section (b) of Article 4 shall be of no further force and effect.

3. Venator Group Specialty, Inc. is also the parent company of FootLocker, Inc.

were unsuitable for permanent conversion, either because they had only a short amount of time remaining in their lease terms or for other business reasons. Unlike a permanent conversion, a temporary conversion to an outlet store could be implemented quickly and cheaply.

It was not economically feasible for Woolworth to open a permanent Foot-Locker store at the Park Road site under its existing lease with Saul. The lease had only two-and-a-half years left in its term, and Woolworth did not need nearly as much space for a FootLocker store as it had rented for its general merchandise store. To enable it to pursue a permanent conversion, Woolworth proposed that Saul take back two-thirds of the demised space, extend the lease to January 31, 2008, and adjust the minimum rent and additional rent obligations accordingly. The lease modification negotiations, which began in August 1997, appeared promising, and both parties took preparatory steps in anticipation that a deal would be struck along the lines Woolworth sought. Saul arranged for necessary inspections of the premises, obtained an estimate of construction costs from an independent contractor, and showed the space that Woolworth proposed to surrender to at least one potential tenant. Woolworth obtained architectural and design plans and an asbestos hazard survey, approved the design of a new FootLocker sign, hired an independent contractor to clean out the premises, and requested bids from construction contractors.

In late November 1997, however, the lease modification negotiations foundered. Following a change in its personnel, Saul concluded that the proposed deal was not to its liking. With a conversion to a permanent FootLocker store not a viable option under its existing lease, Woolworth considered its alternatives. "If there is no interest [in modifying the lease]," Woolworth advised Saul by letter dated November 24, 1997, "we will most likely open as an outlet and run out the term of the lease. Obviously, this is not our preferred method." Woolworth was ambivalent about reopening the Park Road store as a temporary FootLocker outlet. As Woolworth's Director of Construction reported on January 8, 1998, the proximity of two other FootLocker stores was "forcing [Woolworth's] operations people to further study the feasibility of this location." Nonetheless, after briefly examining the possibility of purchasing the Park Road property from Saul, Woolworth decided in January 1998 to convert the premises to a temporary FootLocker outlet store—by Woolworth's description, a "bare bones" conversion—which would operate only until the lease expired in January 2000.

By letter dated January 14, 1998, Woolworth informed Saul of its decision to open a FootLocker outlet store. The January 14 letter also contained Woolworth's first response to Saul's November 13, 1997 letter declaring that Woolworth had vacated the premises and would owe One of Three rent in the amount of $168,174.64 beginning with calendar year 1997. In view of its announced intention to open a temporary outlet store, Woolworth denied that it had vacated the premises and stated that it would continue to pay additional rent calculated on the basis of its annual sales volume.

The next day, Saul notified Woolworth that it was in default for failure to make its previously demanded One of Three rent payment for 1997.

Thereafter, Woolworth reported its Park Road store sales for the (truncated) calendar year 1997 to Saul and tendered a check for $88,866.48. The check stub stated that the payment was for "1/97—12/97 Percentage Rent" (i.e., six percent of

Woolworth's calendar year 1997 sales at the Park Road store in excess of $1,291,667). Nothing else was said to suggest that the check was offered as payment in full of the disputed rent obligation. Saul accepted and cashed the check, notifying Woolworth in writing that it considered it to be "a payment on account and not full payment" of the additional rent due for calendar year 1997. Woolworth then sent Saul a second additional rent check in the amount of $62,387.32.[4] Woolworth advised Saul that it made this second payment under protest and reserving all rights, solely to avoid the consequences of being deemed in default of its obligations under the lease. Saul accepted the payment. Woolworth then continued to make its monthly minimum rent payments for the duration of the lease, but did not make further One of Three payments.

Even after January 14, 1998, Woolworth continued to waver in its commitment to opening a FootLocker outlet in the Park Road premises. Ultimately Woolworth abandoned the plan. Aside from a few preliminary preparations and some minor construction in May 1998, Woolworth never did anything to transform the store space into the proposed outlet. Woolworth never resumed retail or other business activity at the site.

## II.

Saul filed suit against Woolworth for breach of contract in February 1998. Saul claimed that Woolworth "vacated" the premises within the meaning of Article 4(b) of the lease when it closed down its store in October 1997, and that Woolworth was liable for One of Three rent for all of calendar year 1997 and for succeeding years until the lease expired. Woolworth contended that it did not vacate the premises until 1998 and that it was obligated to pay One of Three rent only from the date on which it vacated. Woolworth also contended that Saul's claim for One of Three rent for 1997 was barred by the doctrine of accord and satisfaction because Saul had cashed the check for $88,866.48 that Woolworth had tendered in payment of its percentage rent obligation for that year.

The case was tried to the court sitting without a jury. The trial judge ruled that Woolworth owed One of Three rent for the entire calendar year in which it vacated the leased premises, i.e., without proration. The judge also concluded that Woolworth vacated the premises in 1998 rather than 1997. The judge arrived at that conclusion because he construed the term "vacate" in Article 4(b) of the lease to signify the cessation of operations "coupled with an expressed intention to discontinue any operations." Woolworth did not decide to discontinue its operations in the demised premises, the judge found, until some time in 1998. Accordingly, the judge ruled that Woolworth did not owe One of Three rent for 1997 and awarded Saul $228,862.68 instead of the $367,266.05 that Saul had sought based on its claim that Woolworth had vacated in 1997.[5] Having rejected

4. Woolworth's second payment was for One of Three rent for the period from October 18, 1997, to February 28, 1998. Woolworth selected October 18, 1997 as the starting point because it contended that the One of Three rent was owed only from the date on which it (allegedly) vacated the premises, and not for the entire calendar year in which it vacated, as Saul contended.

5. Because there was no dispute as to Woolworth's past sales figures and percentage rent payments, the parties were able to stipulate to the amount of damages depending on how the judge ruled on the other issues. In brief, the parties agreed that if Woolworth vacated in 1997, its annual One of Three rent obligation under Article 4(b) of the lease was $168,174.64 (representing one third of Woolworth's percentage rent payments in calendar

Saul's claim for One of Three rent for 1997 on its merits, the judge did not rule specifically on Woolworth's alternative claim of accord and satisfaction. The judge found as a fact, however, that Woolworth's check for additional 1997 rent in the amount of $88,866.48 did not bear any notation that it was tendered as payment in full of a disputed claim, and that Saul did not accept the check as such.

## III.

Only Saul has appealed from the trial judge's decision. Its appeal presents two issues for us to decide. The first issue is when Woolworth "vacated" the demised premises within the meaning of Article 4(b) of the lease—in 1997, when Woolworth closed its store to the public, removed its employees, inventories and fixtures, and permanently left the store empty and idle, or later, in 1998, when Woolworth decided not to reopen that store as a FootLocker outlet. The second issue is whether Saul's acceptance of the percentage rent payment that Woolworth tendered for calendar year 1997 bars Saul's claim for One of Three rent for that year under the doctrine of accord and satisfaction.[6]

■■ The material facts, which we have summarized above in accordance with the trial judge's findings, are not in dispute.[7] The questions before us are questions of law, and our review is *de novo.* "This means that the reviewing court will make an independent judgment based upon an original appraisal of the record." *United States v. Felder,* 548 A.2d 57, 61 (D.C. 1988).

We conclude that Woolworth vacated the demised premises in 1997. Woolworth therefore was obligated by Article 4(b) of its lease to pay One of Three rent for calendar year 1997 and succeeding years in an amount equal to one third of the sum of its additional rent payments for the years 1994 through 1996. We further conclude that Saul's claim for One of Three rent for calendar year 1997 was not barred by accord and satisfaction. Accordingly we reverse and remand for the trial court to reenter its award of damages to Saul for Woolworth's breach of contract in an amount that is consistent with the conclusions we have reached.

### A. When Woolworth Vacated the Premises

■■ The question of when Woolworth vacated the premises turns on the proper

---

years 1994 through 1996). On the other hand, if Woolworth vacated in 1998, its annual One of Three rent obligation was $138,359.90 (computed by reference to the percentage rent for calendar years 1995 through 1997). Although the parties disagreed about whether the One of Three rent had to be prorated for the year in which Woolworth vacated the premises, Saul agreed with Woolworth that only one twelfth of the annual One of Three payment was due for 2000 because the lease ended on January 31 of that year. Finally, the parties stipulated as to the credit that Woolworth should receive for the additional rent payments of $88,866.48 and $62,387.32 that it made in 1998.

6. We have no occasion to address the third issue in dispute at the trial of this case, which was whether the lease required Woolworth to pay One of Three rent for the full calendar year in which it vacated the premises or only for the part of the year after it vacated. Woolworth did not cross-appeal and does not challenge the trial judge's ruling in favor of Saul on this issue.

7. "When the trial court sits as fact-finder, its factual findings are accorded considerable deference and are reviewed under a 'clearly erroneous' standard." *Technical Land, Inc. v. Firemen's Insurance Company of Washington, D.C.,* 756 A.2d 439, 443 (D.C.2000) (citing *Davis v. United States,* 564 A.2d 31, 33 (D.C. 1989) (en banc)); *see also* D.C.Code § 17–305(a) (2001).

construction of the word "vacate" in Article 4(b) of the lease. General principles of contract interpretation apply. "Leases of real property are to be construed as contracts." *Capital City Mort. Corp. v. Habana Vill. Art & Folklore, Inc.*, 747 A.2d 564, 567 (D.C.2000). Our task in construing the lease is, therefore, to "determin[e] what a reasonable person in the position of the parties would have thought the disputed language meant." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C.1984). "The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *Id.* Where the language in question is unambiguous, its interpretation is a question of law for the court. *Id.* The language of Article 4(b) is not ambiguous merely because Woolworth and Saul disagree over its meaning. *See Sacks v. Rothberg*, 569 A.2d 150, 154–55 (D.C.1990). Rather, "[a] lease or a clause therein is ambiguous if it is susceptible of more than one reasonable interpretation." *Hart v. Vermont Inv. Ltd. P'ship*, 667 A.2d 578, 584 (D.C.1995). That inquiry, itself "one of law," is to be resolved "on the basis of the face of the language itself, giving that language its plain meaning, without reference to any rules of construction." *Id.* (internal quotation marks and citations omitted).

Like most courts that have construed commercial lease provisions specifying the parties' rights in the event the tenant vacates the demised premises, we see no significant ambiguity here. When used in connection with real property, the term "vacate" has a settled and relatively narrow meaning. That standard meaning makes sense in the context of Article 4(b); it furthers the evident purpose of the provision in which the term "vacate" is used. We are compelled to reject the alternative construction of the term "vacate" that Woolworth proposes and the trial judge adopted because that construction is contrary to the normal usage and is incompatible with the aim of Article 4(b).[8]

In standard legal usage that long predates the execution of the 1949 lease at issue in this appeal, to "vacate" premises means simply "[t]o move out; to make vacant or empty; to leave; especially, to surrender possession by removal; to cease from occupancy." BLACK'S LAW DICTIONARY 1794 (3d ed.1933) (citing *Ruble v. Ruble*, 264 S.W. 1018, 1020 (Tex.Civ.App. 1924) and *Polich v. Severson*, 68 Mont. 225, 216 P. 785, 787 (1923)). The act of vacating alone is sufficient; an intention (expressed or otherwise) on the part of the occupier of the premises to discontinue operations is not required. By comparison, the term "abandon" does require the specific intent to relinquish or give up a right or interest; "[i]t includes the intention, and also the external act by which it is carried into effect." BLACK'S LAW DICTIONARY 4 (3d ed.1933). Hence "abandonment" is defined to mean "vacating property with the intention of not returning." *Id.*

Although this court has not had occasion before now to construe the term "vacate" in a lease, other courts that have done so have recognized and adhered to its traditional meaning. For example, in *PRC*

---

8. Saul argues that because Woolworth drafted the operative language of Article 4(b), any ambiguity in its construction should be construed against Woolworth. Because we perceive no significant ambiguity, we do not rely on this "secondary" rule of construction. *See 1901 Wyoming Ave. Coop. Ass'n v. Lee*, 345 A.2d 456, 463 (D.C.1975) (agreeing with other authorities that the principle of construing ambiguities in an integrated agreement against the drafter is a "secondary rule" that "applies only after the ordinary rules of construction have been applied and the agreement is still ambiguous").

*Kentron, Inc. v. First City Ctr. Assocs. II,* 762 S.W.2d 279 (Tex.App.1988), the tenant leased a floor of an office building for use as its headquarters. The lease provided that the tenant would be in default if it "desert[ed] or vacate[d] any substantial portion of the Premises." *Id.* at 280. When the tenant decided to move its headquarters out of state, it removed its personnel, working files, equipment, and most of its furnishings from the premises. Although the tenant argued that it continued to pay rent when due and "intended within a reasonably short time either to sublet the premises or to restaff its offices there," *id.* at 282, the court held that the tenant had vacated the premises and thereby breached the lease. Distinguishing such terms as "desert" and "abandon," the court held that "in ordinary parlance," the term "vacate" means only to render the premises "without content or occupant," and "does not require an intent to forsake." *Id.* "Using the ordinary meanings of the words," and finding the lease provision unambiguous, the court concluded that "the lease clearly provides that Tenant is in default if it moves out, regardless of how long it is gone, whether it intends to return, and whether it pays rent in the meantime." *Id.* at 283. *See also Scot Props. v. Wal–Mart Stores Inc.,* 138 F.3d 571, 574 (5th Cir.1998) (agreeing with *PRC Kentron* that the term "vacate" does not contain the element of "intent to forsake" that is found in the terms "desert" and "abandon"); *Liqui–Box Corp. v. Estate of Elkman,* 238 N.J.Super. 588, 570 A.2d 472, 477 (App.Div.1990) (holding that, "since vacating required no evidence of intent beyond an intentional removal of animate and inanimate objects," the tenant had vacated the premises even though it continued to pay rent as required by the lease

and was trying to negotiate a sublease arrangement when it moved out); *Bishop's Corner Assocs. Ltd. P'ship v. Service Merch. Co., Inc.,* 45 Conn.Supp. 443, 720 A.2d 531, 536 (1997), *aff'd,* 247 Conn. 192, 718 A.2d 966 (1998) ("While abandonment necessarily implicates an intent to give up the leasehold interest; vacating has generally been construed to mean a more physical emptying of the building. Thus, a building can quite easily be vacated without being abandoned.").

Of course we do not construe the term "vacate" in a vacuum. The question is what the term means as it is used in Article 4(b) of the lease between Saul and Woolworth. Article 4(b) provided for Woolworth to pay additional rent based on its sales, unless it vacated the premises, in which case Woolworth would have to pay One in Three rent instead. Under ordinary circumstances, therefore, Article 4(b) tied the additional rent that Saul would receive to the success or failure of Woolworth's retail efforts at the premises (subject to the floor provided by the minimum annual rent). This economic arrangement made sense and was fair to Saul so long as Woolworth continued to operate a store at the premises. If for any reason Woolworth shut down its store and ceased operations, its sales would be non-existent and the economic rationale for Saul to accept percentage rent based on sales would disappear. The evident purpose of the One in Three rent provision was to address that contingency. To effectuate the purpose of that provision, we therefore should construe the term "vacate" as coextensive with cessation of operations pure and simple, in accordance with its settled meaning as discussed above, regardless of Woolworth's specific intentions in the matter.[9]

9. In theory Woolworth could have ceased operations entirely without physically vacating

the premises. That is an unrealistic scenario, however. Once Woolworth elected to shut

From Saul's standpoint, the economic impact of a prolonged cessation of business operations at the store was the same whatever Woolworth intended.

Woolworth argues, however, that the term "vacate" must be understood to require an intent on its part to cease business operations because other provisions of the lease permitted Woolworth to shut down temporarily in order to renovate the premises or convert them to a different use (such as a FootLocker store) and then reopen.[10] That is, provisions of the lease permitted Woolworth to remove "any and all" of its trade fixtures and other property and to make whatever structural alterations it wished in the premises, and the lease did not include a continuous operation requirement or any restriction on the use that Woolworth made of the premises. A lease containing similar provisions was before the court in *Oklahoma Plaza Investors v. Wal–Mart Stores, Inc.*, 155 F.3d 1179 (10th Cir.1998). The landlord in that case claimed that Wal–Mart, the tenant, vacated the premises—an event of default under the lease—when it closed its store, assigned the lease to a third party, and allowed the premises to remain empty for over two years (while continuing to meet its minimum rent obligations). The court disagreed with the landlord because the lease gave Wal–Mart the right to use the premises for any purpose (except a supermarket), to remove its goods at any time, and to assign the lease without the landlord's consent. "Wal–Mart cannot 'vacate' *within the meaning of this lease*," the court held, "by doing what the lease expressly provides." *Id.* at 1181 (emphasis added). So too, in this case, Woolworth argues, it cannot "vacate" by doing what its lease expressly provides it can do.

We think that Woolworth's reliance on *Wal–Mart Stores* is misplaced. In that case the court was confronted with an apparent contradiction: the lease permitted the tenant to assign it without the landlord's consent and leave the demised premises, and yet the lease also made it an event of default for the tenant to "vacate" the premises. To resolve that seeming inconsistency, the court found it necessary to reject the ordinary meaning of the term "vacate." But we are faced with no such necessity in this case. There is no inherent inconsistency for us to resolve in the Woolworth lease, because the Woolworth lease did not make vacating the premises an event of default.[11] Vacating merely meant that Woolworth's additional rent obligation was to be calculated on the basis of past rather than current sales volume. That provision was entirely compatible with the other provisions in the lease that allowed Woolworth considerable freedom to operate in the premises as it saw fit.

We are inclined to agree that a reasonably brief closure of the store for remodel-

down its store, it had no reason to keep its employees or valuable inventories and removable trade fixtures on the premises. It had every incentive to remove them and put them to use or otherwise limit its losses.

**10.** Woolworth endorses the particular formulation of the trial judge, who concluded in his ruling from the bench that the term "vacate" meant "to cease operations coupled with an *expressed* intention to discontinue any operations" (emphasis added). Even if we were to agree that Woolworth's intentions were relevant, we would find this formulation flawed

in its insistence on an express acknowledgment by Woolworth of its intention to cease doing business in the premises. We think it unreasonable to read Article 4(b) to allow Woolworth to cease doing business indefinitely but still avoid paying any additional rent by the simple expedient of not admitting its true intentions. We do not think that is what the trial judge meant to say.

**11.** Nor did the Woolworth lease permit the tenant to assign the lease without the landlord's consent.

ing would not be equivalent to "vacating" under Article 4(b) even if the store was emptied temporarily of its contents for that purpose. We incline to that view not merely because the lease permitted Woolworth to remove its property and make alterations, but also because a reasonably brief interruption of business for remodeling does not implicate the economic concerns that led to the inclusion of the One of Three rent provision in Article 4(b).[12] But that is not what happened here. In the first place, the evidence shows unequivocally that when Woolworth shut down and emptied its Park Road store in October 1997, it did not have a firm intent to reopen the store as a converted Foot-Locker or otherwise. Woolworth shut down the store indefinitely, without knowing what if anything it would do thereafter in the premises. Even though Woolworth was negotiating seriously and in good faith to modify its lease so as to enable it to pursue a permanent conversion, and even though Woolworth made meaningful preparations for such a conversion, its intention to reopen as a permanent FootLocker store was contingent—it depended on the success of the negotiations. Woolworth did not intend to open a permanent Foot-Locker under its existing lease. And although Woolworth considered installing a temporary FootLocker outlet store as an alternative possibility if the negotiations were unsuccessful, Woolworth did not embrace that alternative until January 1998— more than two months after it closed its general merchandise store. In short, this case is not properly characterized as one in which the tenant intended only to close down temporarily for renovation or conversion of the premises.

More important in our thinking, though, is that whatever Woolworth's intentions, the fact remains that it ceased operations in October 1997, emptied the premises at that time, and never did reopen for business or otherwise make use of the premises thereafter. The closing was not temporary, it was permanent. The lease provisions that Woolworth cites may justify treating a temporary closure as something other than vacating, but it does not follow that those provisions mandate treating a permanent closure the same way. To do that would be unacceptable, we think, because it would thwart the purpose of the One of Three rent provision in Article 4(b).

We conclude that Article 4(b) uses the term "vacate" in its standard sense. Even if Woolworth was considering the possibility that it might open a FootLocker outlet at the site, when Woolworth permanently closed its Park Road store to the public, removed its employees, inventory and trade fixtures, and turned a key to the store over to its landlord, Woolworth vacated the demised premises within the meaning of Article 4(b). Woolworth therefore became obligated to pay One of Three rent in lieu of percentage rent for calendar year 1997 as well as for subsequent years for the duration of the lease.

### B. Accord and Satisfaction

■■■ "[A]n accord and satisfaction is a valid affirmative defense to a breach of contract claim where there is proof of: (1) a legitimately disputed or unliquidated claim, (2) a mutual agreement that the debtor will pay and the creditor will accept something other than the original amount due in satisfaction of the disputed claim,

---

12. As the trial judge noted, a Saul executive testified that "[i]f the tenant notifies us they're going to close their door, remodel and open, and they're asked for an understanding to that effect, it's hard for me to say that our view is that the tenant has vacated the premises."

and (3) the actual giving and taking of the agreed upon substitution." *Pierola v. Moschonas,* 687 A.2d 942, 947 (D.C.1997). "Often, accord and satisfaction arises as a defense when one party tenders a check to the other that contains the phrase 'payment in full' or other words to that effect." *Id.* "[W]here the amount due is in dispute, and the debtor sends cash or check for less than the amount claimed, *clearly expressing his intention that it is sent as a settlement in full,* and not on account or in part payment, the retention and use of the money or cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction." *Id.* (quoting 6 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1279 (1962) (emphasis supplied, internal quotation marks omitted)).

We do not agree with Woolworth that Saul's cashing of its check for $88,866.48 represented an accord and satisfaction. While an accord and satisfaction "need not be explicit, but [may] be implied from the silent act of cashing a check containing a notation of payment in full," *id.,* that implication cannot be drawn here. In tendering the check, Woolworth did not "clearly express" its intention that the payment be treated as settlement in full of Saul's claim for additional 1997 rent. The check did not bear the notation "payment in full" or other words to that effect; the reference on the check stub to percentage rent was not sufficient by itself to convey that message with the requisite clarity, for it could have signified only Woolworth's acknowledgment that it owed at least that much. Nor did Saul accept the check as anything other than "a payment on account and not full payment," as Saul said at the time. In short, we do not have the "mutual agreement that the debtor will pay and the creditor will accept something other than the original amount due in satisfaction of the disputed claim" that is a prerequisite for the doctrine of accord and satisfaction to operate. *Pierola,* 687 A.2d at 947.

## IV.

We hold as a matter of law that Woolworth vacated the demised premises in 1997. Woolworth thereby became liable under Article 4(b) of its lease to pay One of Three rent for that calendar year to Saul. We further hold that Saul's claim for that rent is not barred by accord and satisfaction. Saul is therefore entitled to damages for breach of contract in an amount greater than the trial judge awarded. There appears to be no dispute between the parties over what that amount should be. See footnote 5, *supra.* We reverse the judgment on appeal and remand for correction of the damages award and such other determinations, if any, as our resolution of the issues necessitates.