**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 97-50066**

---

**SCOT PROPERTIES LTD,**

**Plaintiff - Appellant,**

**VERSUS**

**WAL-MART STORES INC,**

**Defendant - Appellee.**

---

**Appeal from the United States District Court**
**For the Western District of Texas**

---

**April 3, 1998**

Before MAGILL,[*] SMITH, and DeMOSS, Circuit Judges.

DeMOSS, Circuit Judge:

Wal-Mart Stores, Inc. ("Wal-Mart") operated a discount retail store at 9817 Dyer in El Paso, Texas. Wal-Mart acquired the right to operate the store at that location pursuant to a sublease obtained from Gibson Distributing Company, Inc., Permian Basin. Under this sublease agreement and several subsequent amendments to the agreement, Wal-Mart agreed to pay a base amount of rent ("minimum rent") plus a percentage of its gross sales over a

---

[*] Circuit Judge of the Eighth Circuit, sitting by designation.

specified amount for each year of the sublease ("percentage rent").

In 1994, Wal-Mart began to construct a new store at 4530 Woodrow Bean - Transmountain Drive, about two miles away from the store on Dyer. The Dyer store was permanently closed at the end of the day on August 15, 1995. The new Wal-Mart on Transmountain was opened on August 16, 1995. Because Wal-Mart no longer operated its retail business at the Dyer location after opening the Transmountain store, it produced no further gross sales at the Dyer premises. Consequently, Wal-Mart continued to pay its minimum rent under the sublease but ceased paying percentage rent because there were no gross sales generated at that location.

Scot Properties, Ltd. ("Scot"), the successor to the sublessor's interest in the space at 9817 Dyer leased by Wal-Mart, seeks to recover lost percentage rent under several theories. First, it claims that Wal-Mart has breached the sublease by deserting the Dyer premises. The sublease provides that a default occurs "[i]f the Demised Premises shall be deserted for a period of over 30 days." Second, Scot claims that Wal-Mart breached by failing to continue to pay percentage rent. The sublease provides that Wal-Mart shall pay minimum rent and percentage rent based on gross sales, "whether such sales be obtained at the Demised Premises or elsewhere." Scot argues that this language covers gross sales at the Transmountain store, and therefore Wal-Mart still owes percentage rent. Finally, Scot alleges that Wal-Mart has violated express and implied covenants in failing to pay percentage rent based on gross sales at the Transmountain store.

-2-

The "or elsewhere" language referenced above is alleged to create an express covenant that covers sales at the Transmountain store. The numerous implied covenants alleged by Scot are all based on the idea that Wal-Mart was obligated to continue operations that would generate percentage rent.

Scot and Wal-Mart filed motions for summary judgment in the district court. Summary judgment was entered in favor of Wal-Mart. Scot appeals, seeking reversal of the judgment entered by the district court. Scot requests that we render judgment in its favor, or, in the alternative, remand the case for trial. We affirm.

*I. Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We review a grant of summary judgment de novo. *See, e.g.*, **Wren v. Towe**, 130 F.3d 1154, 1158 (5th Cir. 1997).

*II. Desertion*

On August 15, 1995, Wal-Mart conducted its last day of retail business at the Dyer location. Because Wal-Mart removed its inventory, signs, and fixtures and boarded up the Dyer location, Scot contends that Wal-Mart has deserted the premises and is

therefore in default of its obligations under the sublease.[1]  Wal-Mart, on the other hand, argues that it has not deserted the premises because it continues to be the tenant in occupancy, retains the keys and controls the space to the exclusion of all (including the landlord), meets all of the lease obligations (including payment of minimum rent and whatever percentage rent may be due), pays utilities and taxes, maintains a security system, secures and controls access to the premises, and continues to seek out potential assignees or subtenants for the space.

In construing the unambiguous terms of a contract, we give the words their ordinary meaning unless other provisions suggest a contrary meaning.  *See* ***Southern Life & Health Ins. Co. v. Simon***, 416 S.W.2d 793, 795 (Tex. 1967).  The term "desert" means "to withdraw from or leave permanently or less often temporarily (as a place): QUIT."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 610 (1971); *see also* BLACK'S LAW DICTIONARY 446 (6th ed. 1990) ("To leave or quit with an intention to cause a permanent separation; to forsake utterly; to abandon.").  Wal-Mart's conduct

---

[1]  The sublease contains the following provision:

> 13.  <u>DEFAULT CLAUSE</u>
> (a)  If the Demised Premises shall be deserted for a period of over 30 days . . . this Sublease, if the Sublessor so elects, shall thereupon become null and void, and the Sublessor shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Sublessee or other occupants thereof and their effects, without being liable to any prosecution therefor.  * * *

2 R. 283-84.

with respect to the leased premises does not constitute desertion. It is not enough for Scot to simply show that Wal-Mart has removed its day-to-day business operations from the site.  A desertion implies a complete and permanent separation -- a construction that is inconsistent with Wal-Mart's continued maintenance of the property.

Scot seeks to apply a definition of "deserted" that would make the term synonymous with "vacated."  Along this line of reasoning, Scot relies heavily on the case of **PRC Kentron, Inc. v. First City Ctr. Assocs., II**, 762 S.W.2d 279 (Tex. App.--Dallas 1988, writ denied) (Hecht, J.), in which the court held that when a lease provides for default when the tenant "deserts or vacates," the tenant defaults "if it moves out, regardless of how long it is gone, whether it intends to return, and whether it pays rent in the meantime."  **PRC Kentron**, 762 S.W.2d at 283.  If that were the applicable standard in the present case, Scot would have a stronger argument.  On the facts of this case, however, the **PRC Kentron** case is easily distinguishable.  The lease in that case specified that the tenant was in default when it "deserts or vacates" the premises.  Here, Wal-Mart was only obligated not to desert.  The court in **PRC Kentron** expressly acknowledged that "vacate" sets up a lower standard than "desert."  **Id.** at 282.  It noted that "desert" contains an element of "intent to forsake" which is more fully suggested by the term "abandon."  **Id.**  "Vacate" does not contain that element.  See **id.**  Thus, the standard ultimately applied by the court in **PRC Kentron** is inapplicable to the present

dispute because that formulation only tells us whether the tenant vacated the premises. Scot has the greater burden of demonstrating desertion, which it has not met.

Sophisticated parties negotiated this sublease with the assistance of counsel, and we presume that they were fully aware of the implications of the language chosen to express their agreement. *See* **Accelerated Christian Educ., Inc. v. Oracle Corp.**, 925 S.W.2d 66, 74 (Tex. App.--Dallas 1996, no writ) (citing **M/S Bremen v. Zapata Off-Shore Co.**, 407 U.S. 1, 12, 15 (1972)). As demonstrated by the discussion in **PRC Kentron**, a range of vocabulary was available to the parties to express what conduct was intended to trigger the default clause. The parties chose the term "deserted," which does not describe Wal-Mart's conduct with respect to the Dyer premises. We will not ignore the unambiguous terms of the parties' agreement. We therefore conclude that the district court properly determined that Wal-Mart did not desert the premises.

*III. Percentage Rent*

Scot offers two arguments that the express language of the sublease requires Wal-Mart to pay percentage rent based upon the gross sales at the Transmountain store. First, Scot argues that Wal-Mart is in default because it has failed to pay percentage rent reserved under the sublease for ten days after written notice. Second, Scot claims that Wal-Mart has violated an express covenant

to pay percentage rent based on Wal-Mart's annual gross sales.[2] Both of these arguments depend ultimately on Scot's interpretation under the sublease of the definition of gross sales.

The sublease provides that "[t]he term 'Gross Sales' as used herein means gross sales of Sublessee, whether such sales be obtained at the Demised Premises or elsewhere." Scot asserts that gross sales obtained at Wal-Mart's Transmountain store are

---

[2] The relevant sublease provision provides:

> 3. RENTAL: Sublessee shall pay to Sublessor as rent for said Demised Premises as follows:
> * * *
> (b) Percentage Rent:
> (1) Beginning with the second (2nd) Sublease Year and for each successive year during the sublease term and any extensions, Sublessee shall pay, in addition to the Minimum Rent, Percentage Rent according to the following schedule:
> > (a) February 1, 1984 through January 31, 1989 one percent (1%) of Sublessee's Gross Sales exceeding Sixteen Million Dollars ($16,000,000.00);
> > * * *
> > (e) February 1, 2004 through February 5, 2009 one percent (1%) of Sublessee's Gross Sales exceeding Twenty Five Million Dollars ($25,000,000.00);
> > * * *
> > (5) The term "Gross Sales" as used herein means gross sales of Sublessee, whether such sales be obtained at the Demised Premises or elsewhere and whether evidenced by check, credit, charge account, exchange or otherwise, and shall include, but not be limited to the amounts received from the sale of goods, wares and merchandise, and for services performed, together with the amount of all orders taken, received or filled at the Demised Premises. * * *
> > * * *

2 R. 274-77.

"obtained . . . elsewhere," and therefore included in the definition of gross sales for the purposes of calculating the percentage rent owed under the sublease. In support of this interpretation, Scot offers the following definition of "elsewhere": "in or to another place." Scot also observes that the Transmountain store is obviously a replacement for the Dyer store, as evidenced by the timing of the opening of the Transmountain store and the closing of the Dyer store, as well as the fact that Wal-Mart referred to the old Dyer store as "Store 0500" and now refers to the new Transmountain store as "Store 0500."

We suspend our disbelief and engage Scot's argument. Indubitably, the Transmountain store is not located on the demised premises, and therefore it is located "elsewhere." That Scot is therefore entitled to collect percentage rent from gross sales at the Transmountain store, however, simply does not follow. This is so because with such an interpretation the "elsewhere" language would encompass the new Transmountain store even if the Dyer store had never closed, and, for that matter, every other Wal-Mart store in the universe.

In its appellate brief, Scot belittles this reasoning, which was also employed by the district court:

> *Imagining* that the "elsewhere" language gave Scot a claim for Percentage Rent on gross sales of every Walmart store in the country, the district court spooked itself into disregarding the "elsewhere" language itself and Scot's simple and reasonable claim that Walmart owes Percentage Rent on its gross sales at the Demised Premises and the Transmountain Store -- nothing more, nothing less.

Scot Brief at 16-17 (emphasis in original, record citations omitted).  If the claim is truly "simple and reasonable," Scot would have demonstrated how the "elsewhere" of the sublease covers the gross sales at the Transmountain store, and "nothing more, nothing less."  They did not.  We cannot.

Whatever sales are covered by the reference to "gross sales . . . obtained . . . elsewhere," and we decline to pontificate about the circumstances which would create such a sale, we are confident that they do not cover Wal-Mart sales made at stores other than one that may be located at 9817 Dyer in El Paso, Texas.  The lease does not entitle Scot to percentage rent based on gross sales at Wal-Mart stores in Never-Never Land, Erewhon, or Area 51 -- nor the one at 4530 Woodrow Bean - Transmountain Drive in El Paso, Texas.  In evaluating all parts of the sublease and the circumstances surrounding the formulation of the sublease, *see* ***Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.***, 940 S.W.2d 587, 591 (Tex. 1996), we can safely conclude that the sublease was not intended to bestow upon the sublessor a one-percent cut of Wal-Mart's global gross sales.  Scot's expansive definition of gross sales subject to percentage rent under the sublease is an unreasonable, and therefore unacceptable interpretation.  *See* **id.** We thus conclude that the district court correctly determined that Scot is not entitled to percentage rent based on sales at the Transmountain store.

*IV. Implied Covenants*

Finally, Scot resorts to arguing that the various agreements relevant to the sublease created implied covenants which were breached when Wal-Mart closed its Dyer store and opened its Transmountain store. Specifically, Scot alleges that the parties agreed that Wal-Mart's obligations under the sublease included the following duties: (a) payment of "percentage rent"; (b) payment of adequate rent (including "percentage rent"); (c) not diverting rent, including "percentage rent," from the landlord; (d) not diverting sales income from the landlord; (e) occupation, use, and operation of the "Demised Premises"; and (f) reasonable operation of its business.[3]

None of the aforementioned alleged agreements are expressly set out in the sublease or in any of the subsequent agreements pertaining to the sublease. Scot is thus in the position of suggesting that we read implied covenants into the sublease. Implied covenants are disfavored under Texas law. *See **Danciger Oil & Refining Co. v. Powell***, 137 Tex. 484, 490, 154 S.W.2d 632, 635 (1941); ***Nalle v. Taco Bell Corp.***, 914 S.W.2d 685, 687 (Tex. App.-- Austin 1996, writ denied).

Texas courts have repeatedly refused to imply the sort of "continuous operations" covenant advocated by Scot. *See, e.g.*, ***Nalle***, 914 S.W.2d at 687-88; ***Weil v. Ann Lewis Shops, Inc.***, 281

---

[3] Scot also alleged that Wal-Mart is subject to an implied covenant not to desert the premises. As discussed, *supra*, Wal-Mart is expressly prevented from deserting the premises by the terms of the sublease, and we have concluded that Wal-Mart has not deserted the premises.

-10-

S.W.2d 651, 656 (Tex. Civ. App.--San Antonio 1955, writ ref'd);[4] *Palm v. Mortgage Inv. Co.*, 229 S.W.2d 869, 873-75 (Tex. Civ. App.--El Paso 1950, writ ref'd n.r.e.). The reasoning applied in these cases applies to the present case.

First, we reject Scot's contentions that covenants to actually pay percentage rent or to pay an "adequate" rent should be implied. *See Nalle*, 914 S.W.2d at 688; *Weil*, 281 S.W.2d at 656. When the parties negotiated the amount of minimum rent due under the sublease, they determined the minimally adequate rent. It was within the contemplation of the parties that Wal-Mart's gross sales in any given year might not be sufficient to generate percentage rent under the sublease. In such a case, the minimum rent is the sublessor's protection against receiving an inadequate amount. *See Nalle*, 914 S.W.2d at 688; *Weil*, 281 S.W.2d at 656. This much seems obvious from the sublease's use of the term "minimum rent," which would be a misnomer if that amount were not actually the minimum amount of rent that might be due. The sublease is a detailed agreement negotiated by sophisticated parties with the assistance of counsel, and we cannot conclude that the new terms suggested by Scot were contemplated by the parties but inadvertently left out of the agreement. *See Danciger Oil & Refining*, 137 Tex. at 490, 154 S.W.2d at 635.

---

[4] Notably, because the Supreme Court of Texas refused the writ of error in *Weil*, that decision has the same precedential authority as an opinion of the Supreme Court. *See Hamilton v. Empire Gas & Fuel Co.*, 134 Tex. 377, 383-84, 110 S.W.2d 561, 565-66 (1937).

Second, we reject Scot's contentions that Wal-Mart was impliedly obligated to occupy, use, or operate the Dyer premises, or to reasonably operate its business on the premises. As the Texas courts have noted, dictating such an implied term is improper if for no other reason than that it would be impossible to determine what constitutes reasonable operations or to determine damages for failure to continuously operate. *See Weil*, 281 S.W.2d at 656. Moreover, it bears repeating that when sophisticated parties have negotiated extensively to produce a well-written and comprehensive sublease, it takes an exceptional case to imply additional terms in the agreement. *See Danciger Oil & Refining*, 137 Tex. at 490, 154 S.W.2d at 635; *Nalle*, 914 S.W.2d at 688; *Weil*, 281 S.W.2d at 656; *Palm*, 229 S.W.2d at 873-74. This point is especially salient in this case since Wal-Mart has been held liable for breaching a lease by ceasing operations when the lease contained a clause obligating Wal-Mart to "operate its business . . . with due diligence and efficiency in an effort to produce all of the gross sales which may be produced by such manner of operation." *United Dominion Realty Trust, Inc. v. Wal-Mart Stores, Inc.*, 413 S.E.2d 866, 868 (S.C. Ct. App. 1992). If the parties agreed that Wal-Mart was obligated to continuously operate, they knew how to make the sublease reflect that agreement. They did not do that, and, indeed, it is more likely that the parties either had no agreement on the subject or specifically agreed not to include the language. Whatever the case, Texas courts have not implied continuous operations covenants in this scenario, and neither will we.

Implicitly, then, we also conclude that Wal-Mart had no implied obligation to avoid diverting rent or sales proceeds from the sublessor. The suggestion that Wal-Mart cannot conduct activities off the premises that might cause there to be fewer gross sales at the Dyer location presumes that Wal-Mart has an obligation to actually conduct business operations and generate percentage rent. We have concluded that they do not.

In sum, we conclude that the district court correctly declined to find that Wal-Mart had breached any implied covenants. This result is consistent with Texas law, which has taken a negative view of implied covenants, particularly those of the variety advocated by Scot. As the Supreme Court of Texas has stated, "[i]t is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly." *Danciger Oil & Refining*, 137 Tex. at 490, 154 S.W.2d at 635. That is all that Scot has done. We, therefore, are powerless to rewrite the lease to which the negotiating parties freely agreed.

*V.   Conclusion*

For the aforementioned reasons, we AFFIRM the judgment of the district court.

AFFIRMED.