**WASHINGTON AUTOMOTIVE COMPANY, Appellant,**

v.

**1828 L STREET ASSOCIATES, Appellee.**

**No. 05–CV–166.**

District of Columbia Court of Appeals.

Argued March 8, 2006.
Decided Sept. 14, 2006.

John Fenn Foster, Washington, DC, with whom Scott M. Perry, was on the brief, for appellant.

Michael Evan Jaffe, with whom Wendy M. Yoviene, Washington, DC, was on the brief, for appellee.

Before RUIZ, GLICKMAN, and FISHER, Associate Judges.

RUIZ, Associate Judge:

Washington Automotive Company, a commercial landlord, appeals the decision of the trial court granting a motion to confirm an appraisal brought by 1828 L Street Associates, its commercial tenant. We hold that the appraisal is an arbitration award enforceable under the District of Columbia Arbitration Act, and because the landlord has not met the high burden to set it aside, affirm the trial court's judgment confirming the appraisal.

## I.

The parties entered into a ninety-nine year commercial lease on April 9, 1962, which has been modified by a series of amendments occurring in 1962, 1964, 1967, and 1968. At the heart of the parties' current dispute is the methodology detailed in the lease for determining the rental amount owed by the tenant. The relevant portions of the lease include Paragraph 3, entitled "Rental," which provides for a rental adjustment twenty years from the beginning of the lease term, and every ten years thereafter. The adjusted rent is 6% of the "fair market value of the land (unimproved) developed at that time to its highest and best use treating all of the demised land as an economic whole and determining such value in the manner hereinafter set forth...." As to the manner in which the fair market value is to be determined, the lease provides for an appraisal if the parties disagree on the valuation:

> On or before ninety (90) days prior to the completion of the first twenty (20) years of the term of this Lease and each ten (10) years thereafter, the parties shall agree in writing as to the fair market value of the land as if developed at that time to its highest and best use, which for the purposes of this Lease shall be hereinafter referred to as "fair market value." In the event of their failure to so agree, such fair market value shall be promptly established by appraisal. The LANDLORD and the TENANTS shall each appoint a disinterested real estate appraiser not related to any of them by consanguinity or affinity and who shall have knowledge and experience relative to the value of commercial real estate in the City of Washington, District of Columbia, and who shall be a Member of American Institute of Real Estate Appraisers or who shall have similar qualifications. Written notice of such appointment by each party shall be given to the other on or before the twentieth day following the above adjustment dates of the particular year, and the two (2) so appointed shall on or before the tenth day there-after appoint a third appraiser of like qualifications and non-interest who shall act as their Chairman. The appraisers shall immediately appraise the fair market value and report in writing to the parties hereto within thirty (30) days after the appointment of the Chairman. *The determination of fair market value as to which at least two shall agree shall be final and binding upon the parties hereto as to the fair market value of the said land as aforesaid and shall be the basis of rents to be paid for the period following the adjustment date until the next adjustment date.* Each party hereto shall pay one-half (½) of the cost of such appraisal.

(Emphasis added.)

The lease also contains a general arbitration provision, in Paragraph 21, which provides that "Any controversy or claim arising out of, or relating to this agreement or any breach thereof, shall be settled and adjusted by arbitration in accor-

dance with the rules of the American Arbitration Association, or its successor existing at the time, and judgment upon the award rendered may be entered in any court having jurisdiction thereof."

Since the lease has been in effect, fair market value appraisals were conducted in 1983, 1993, and 2003, and the rent was adjusted accordingly. The 2003 appraisal was conducted pursuant to instructions in a joint letter, dated February 6, 2003, from the landlord and tenant to the two appraisers they had selected, following the procedure set out in Paragraph 3. The letter was signed by both parties' attorneys. The letter set forth the parties' agreed-upon process for the rent adjustment calculation, as well as the process for the two appraisers' selection of a third appraiser, as described in the lease. Of particular importance to this appeal, the letter refers to a section of the lease describing which parcels of the demised land are to be included in the fair market value calculation, and states that the "Landlord and Tenant have mutually agreed that the quoted language means that [certain] lots, added to the demised premises by the 1967 Amendment, are not to be included in the rental adjustment calculations for any purpose...." Attached to the letter were copies of the 1967 amendment to the lease which described the land to be appraised, the "valuation standard and the relevant procedures which are required pursuant to paragraph 3 of the Lease," and copies of plats showing the location of the property.

On April 2, 2003, the panel of three appraisers unanimously determined that the fair market value of the land was $15,600,000, and sent this appraisal to the landlord and tenant. Four months later, on August 4, 2003, the landlord's president wrote to the chairman of the panel of appraisers expressing his displeasure with the appraisers' determination of the fair market value of the land, arguing that the appraisal was "unbelievably low based on market conditions." On November 20, counsel for the landlord—not the landlord's lawyer who had signed the joint February 6, 2003 letter to the appraisers— wrote to counsel for the tenant stating that the landlord "rejects the 2003 appraisal and rent calculations, and have [sic] hired an independent appraiser to determine the fair market value of the land. We are convinced that the instructions provided to the appraisers in your letter of February 6, 2003, are inconsistent with the terms of the Deed of Lease...."

On June 28, 2004, the landlord filed a Demand for Arbitration, invoking Paragraph 21 (Arbitration) of the lease, seeking a "declaration of the proper method to be used to calculate rent under the Deed of Lease, and a recalculation of rent," and seeking arbitration of the matter in West Palm Beach, Florida. On August 18, 2004, the tenant filed a complaint in Superior Court to enforce the 2003 appraisal and to stay the arbitration in Florida. On November 5, 2004, after the landlord had filed its answer and affirmative defenses, the tenant filed a motion to confirm the 2003 appraisal, pursuant to Superior Court Civil Rule 70–I governing the confirmation of arbitration awards under the D.C. Uniform Arbitration Act.[1] On November 23, 2004, the landlord filed a "Motion to Strike Mo-

---

1. Rule 70–I provides:

Applications regarding proceedings under the Uniform Arbitration Act.

(a) *Form and service of applications.* Applications to the Court under D.C.Code § 16–4315 shall be in the form of a motion and be accompanied by a proposed order. The motion and a summons shall be served

in accordance with SCR Civil 4, except that service of the motion may be made in accordance with SCR Civil 5 on any party over whom the Court has already acquired jurisdiction.

(b) *Confirmation of arbitration awards.* An arbitration award, the judicial confirmation of which is authorized by statute or other

tion to Confirm Appraisal and Stay Arbitration, to Order that Plaintiff Submit to Arbitration, and to Dismiss this Case."

The trial court confirmed the appraisal and stayed the arbitration that the landlord had commenced in Florida. In its order, the trial court identified the key legal issue as being the applicability of the D.C. Arbitration Act to the appraisal. That depended, in turn, on whether the February 6, 2003 joint letter from the parties to the appraisers was an agreement made subsequent to enactment of the Act in 1977, and therefore subject to its provisions, "or whether it is in reality the latest periodic reiteration of an agreement first made in 1962." The court found that the 2003 letter was a "fully independent agreement between the parties, signed by their lawyers, requiring the performance of certain actions not only by the parties themselves, but also by independent individuals." The court determined that the letter was a "free-standing agreement secured by adequate consideration consisting of mutual promises and requiring mutual performances by each party." Relying on the Missouri case of *Hefele v. Catanzaro*, 727 S.W.2d 475 (Mo.Ct.App.1987), the court treated the 2003 letter to the appraisers as a "ratification of the reappraisal provisions of the lease after the effective date of the D.C. [Arbitration] Act," which made it subject to the Act. Accordingly, "the only grounds available to contest the reappraisal are those contained in the Arbitration Act, D.C.Code § 16–4311(a) (2001)."[2] Because the landlord had raised

applicable principles of law may be confirmed as a judgment by filing a motion setting forth that (1) there was a written agreement or order to arbitrate, (2) there was an award rendered pursuant to the arbitration, and (3) there are annexed to the pleading copies of the following:

(A) The agreement or order to arbitrate;
(B) The selection or appointment, if any, of any arbitrator or umpire other than that designated in the agreement or order;
(C) Each written extension of time, if any, within which to make the award;
(D) The award;
(E) Each notice, affidavit or other paper used upon any application to confirm, modify, or correct the award; and
(F) A copy of each order upon such an application.

(c) Summary proceedings. Proceedings upon such motion shall be summary with discovery permitted only upon a showing of good cause.

(d) All objections to the motion at law or in equity shall be in the form of an opposition to the motion and stated with particularity. The opposition shall be served within 20 days (60 days if opponent is the District of Columbia, the United States or an officer or agency of either) after service of the motion.

(e) Rehearing. Where the Court vacates an award, it may in its discretion and upon a finding that such re-hearing is not contrary to law or equity, direct an arbitration re-hearing.

Super. Ct. Civ. R. 70–I.

2. § 16–4311(a) (2005): Vacating an award:

(a) Upon application of a party, the Court shall vacate an award where:

(1) The award was procured by corruption, fraud or other undue means;

(2) There was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party;

(3) The arbitrators exceeded their powers;

(4) The arbitrators refused to postpone the hearing upon sufficient cause being shown therefor or refused to hear evidence material to the controversy or otherwise so conducted the hearing, contrary to the provisions of section 16–4315, as to prejudice substantially the rights of a party; or

(5) There was no arbitration agreement and the issue was not adversely determined in proceedings under section 16–4312 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a Court of law or equity is not ground for vacating or refusing to confirm the award.

none of these statutory grounds, the trial court concluded, "[t]he reappraisal must, therefore, be confirmed." The court also found "without merit" the remainder of the landlord's contentions, "that the court cannot stay the pending arbitration in Florida because of paragraph 21 of the 1962 Lease and that plaintiff cannot seek confirmation of the reappraisal because its original complaint seeks a declaratory judgment as to the validity of the appraisal." The court, therefore, granted the tenant's Rule 70–I motion to confirm the April 2, 2003 reappraisal of the fair market value of the property, and stayed the Florida arbitration.

On appeal, the landlord challenges both orders of the trial court.

## II.

There are two primary questions at issue in this case. The first is whether, as the trial court found, the 2003 appraisal was made pursuant to an agreement to arbitrate that can be confirmed and enforced by District of Columbia courts under the authority of the District of Columbia Uniform Arbitration Act (DCAA). *See* D.C.Code § 16–4301 to 4319. The second question, one of contract interpretation, is whether the trial court was correct in rejecting the landlord's claim that the appraisal conducted as provided in Paragraph 3 is itself subject to arbitration under Paragraph 21 of the lease. Both questions are matters of law, which we review *de novo*.[3] *See*

3. The landlord urges us to treat the trial court's order as one granting summary judgment on the tenant's complaint, and to review it accordingly, arguing that there are material facts in dispute. However, neither party moved for summary judgment, and the trial court reached its conclusion on the tenant's motion, filed pursuant to Superior Court Civil Rule 70—I, see *supra*, note 1, to confirm an arbitration award. The landlord cannot now attempt to convert the posture of the present appeal to one arising from a grant of summary judgment in the hope that it might fare better under that standard of review.

Moreover, even if we were reviewing under a summary judgment standard, we would still find for the tenant, as there were no material issues of fact before the trial court precluding judgment as a matter of law for the tenant. *See* Super. Ct. Civ. R. 56. Even without applying the DCAA, the trial court would have granted summary judgment in favor of the tenant because the landlord had presented no basis for disturbing the appraisal performed pursuant to the lease. When parties contract to have the valuation of property accomplished by an appraiser, the appraiser's valuation is binding, and the courts will not set it aside unless the appraisers have "mistaken their authority, departed from the submission, clearly misconceived their duties, acted upon some fundamental and apparent mistake or have been moved by fraud or bias." *Williams v. Williams*, 436 A.2d 1291, 1293 (D.C.1981),

quoted in *Doggett v. McLachlen Bancshares Corp.*, 663 A.2d 511, 515 (D.C.1995). In *Doggett*, as here, after an appraisal was performed pursuant to the terms of a lease, one of the parties disputed the appraiser's interpretation of the lease provision describing the land to be appraised (*e.g.*, the phrase "appraised value of the demised premises as unimproved ground ... valued on the basis of its use for the then existing improvements"). 663 A.2d at 516. There, we held that the appraiser's interpretation of the lease controlled and could not be challenged "as long as it [was] reasonable and [did] not exceed the appraiser's authority." *Id.*

Here, the landlord has presented no disputed material facts that would have precluded summary judgment under the legal standard set forth in *Williams* and *Doggett*. The appraisers' authority is not challenged, and no fraud or mistake is alleged. Although the landlord disagrees with the appraised value determined by the appraisers, their appraisal was unanimous and proceeded according to an interpretation of the applicable lease provision agreed upon by both parties (through their attorneys) articulated in the February 2003 letter. Here, there is not even the claim, as in *Doggett*, that the appraisers misinterpreted the lease, as the parties themselves interpreted the lease for the appraisers in the letter. The landlord now suggests (though it did not present this argument to the trial court) that its attorney was not authorized to

*Feaster v. Vance,* 832 A.2d 1277, 1281–82 (D.C.2003) (noting that issue of statutory construction is a question of law, reviewed *de novo* ); *Motor City Drive, L.L.C. v. Brennan Beer Gorman Monk Architects & Interiors, P.L.L.C.,* 890 A.2d 233, 236 (D.C.2006) (noting that the standard of review on the question of arbitrability is *de novo*).

## A. Applicability of the D.C. Arbitration Act to the Appraisal

■ Although we have previously held that appraisal agreements are treated like arbitration agreements in that they "are accorded deference comparable to that which is given to decisions by arbitrators," *Doggett supra* note 3, 663 A.2d at 516, we have not had occasion to decide whether the provisions of the DCAA apply to agreements to determine property value through an appraisal process. This case presents the issue, and we hold that a written agreement to settle an existing or future dispute regarding the value of land or other property via an appraisal process is, for purposes of the DCAA, an arbitration agreement enforceable as provided in the Act and Superior Court Civil Rule 70–I.

■ The DCAA does not limit the matters that may be subject to arbitration, referring broadly to agreements to arbitrate *"any* existing controversy" or *"any* controversy thereafter arising," so long as it is in writing. D.C.Code § 16–4301(2005) (emphasis added).[4] Nor does the DCAA define the term "arbitration." Similarly, the Federal Arbitration Act, to which we look for guidance in interpreting the DCAA, *see generally Hercules & Co. v. Beltway Carpet Serv., Inc.,* 592 A.2d 1069, 1072–73 (D.C.1991) (holding that federal court decisions construing and applying the federal arbitration act may be regarded as persuasive authority in construing and applying corresponding provisions of our local arbitration act), is silent on the definition of "arbitration." *See* 9 U.S.C. § 2 (2005).[5] The legislative history of the

---

sign the February 2003 letter and bind it to the outcome of the appraisal process which proceeded according to its terms. However, even if we assume that the attorney did not have actual authority to sign the letter on the landlord's behalf, he had apparent authority to do so (as the landlord conceded during oral argument), and any dispute the landlord may have with his attorney about the 2003 letter would not relieve the landlord from its obligations to a third person under the lease and the letter. *See, e.g., Dorsky Hodgson & Partners, Inc. v. National Council of Senior Citizens,* 766 A.2d 54, 56 (D.C.2001) (apparent authority exists and binds the principal when the "principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold"). In sum, the landlord did not demonstrate the "requisite showing of a genuine issue" of material fact requiring a trial "predicated upon the existence of a legal theory which remains viable under the asserted version of the facts." *Doggett supra* note 3, 663 A.2d at 514–15 (citing *Smith v. Washington*

*Metro. Area Transit Auth.,* 631 A.2d 387, 390 (D.C.1993) (citations omitted)).

4. D.C.Code § 16–4301 (2005) provides:
 A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.

5. 9 U.S.C. § 2 (2005) provides:
 A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

DCAA indicates that its purpose, in part, was: "to provide citizens with an additional remedy for resolving disputes, i.e., voluntary arbitration," and "to provide for the validity and enforceability of agreements to arbitrate existing or future disputes." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON JUDICIARY AND CRIMINAL LAW, COMMITTEE REPORT ON BILL NO. 1–140, THE UNIFORM ARBITRATION ACT, at 1 (November 9, 1976). The Committee Report on the DCAA described its potential benefits as making "possible speedy resolution of disputes without suffering or adding to crowded court calendars for civil suits." *Id.* at 3. Additionally, the Committee noted, "[b]y virtue of arbitration agreements made enforceable by this act, the parties can choose arbitrators who are familiar with the practices and customs of a trade, or the current prices, merchantable quality, and the like. Thus the bill affords an opportunity for parties to seek expert decisions in short periods of time." *Id.* This description of the purpose and benefits of the DCAA seems to envision a process exactly like that provided for in Paragraph 3 of the lease and employed by the parties during the 2003 appraisal process: the submission to their choice of experts in the field of property appraisal of a dispute over the fair market value of the demised property.

That the parties described the process as an "appraisal" in the lease and not an "arbitration" does not require us to exclude the appraisal from the DCAA; we have held that the failure of a contract to describe the relevant dispute-resolution process as "arbitration" is "of no legal significance" for purposes of the DCAA. *Meshel v. Ohev Sholom Talmud Torah,* 869 A.2d 343, 361 (D.C.2005) (citing *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,* 858 F.2d 825, 830 (2d Cir.1988)). Thus, in *Meshel,* we held that a provision in the corporate bylaws of an Orthodox Jewish congregation

that required any claim of a member against the congregation that could not be amicably resolved to be referred to a "Beth Din" of Orthodox Jewish rabbis for a binding decision according to Jewish law, was an arbitration clause under the DCAA. *See id.* at 346, 361.

In reaching this conclusion in *Meshel,* we employed traditional principles of contract law to discern whether the parties had agreed to arbitrate. *See id.* at 361 (citing D.C.Code § 16–4301,–4302 (a),–4303 (2001); *Carter v. Cathedral Ave. Coop., Inc.,* 566 A.2d 716, 717–19 (D.C.1989); *American Fed'n of Gov't Employees, Local 3721 v. District of Columbia,* 563 A.2d 361, 362 (D.C.1989)). Noting that it is well established that the bylaws of an organization are contractual in nature, we applied the "objective law" of contracts, which provides that the written language embodying the terms of an agreement governs the rights and liabilities of the parties. *Id.* The bylaws provided that "any claim" of a member against the congregation that "cannot be resolved amicably," "shall" be referred to a Beth Din of Orthodox Jewish rabbis for the issuance of a "Din Torah" and that the Din Torah—or "decision"— "shall be binding on the member and the congregation." *Id.* We held, therefore, that "[g]iven the plain meaning of this contractual language, we conclude as a matter of law that [this provision] of the bylaws clearly and unambiguously sets forth an agreement requiring the congregation and its members to submit 'controversies thereafter arising' between them to binding arbitration before a Beth Din of Orthodox Jewish rabbis," and therefore that the DCAA was applicable to its terms, pursuant to D.C.Code § 16–4301. *See id.*

Similarly, in *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.,* a case on which we relied in *Meshel,* the Second Circuit found that language in a

shareholders' agreement calling for the appointment of an independent tax counsel constituted an enforceable arbitration clause under the federal arbitration act, where the language used "clearly manifests an intention by the parties to submit certain disputes to a specified third party for binding resolution." 858 F.2d at 825, 830. The *McDonnell* court noted that the absence of the word "arbitration" in the agreement was not important, but, "[r]ather, what is important is that the parties clearly intended to submit some disputes to their 'chosen instrument for the definitive settlement of [certain] grievances under the Agreement.'" *Id.* at 830–31 (quoting *International Longshoremen's Ass'n v. Hellenic Lines, Ltd.,* 549 F.Supp. 435, 437 (S.D.N.Y.1982) (holding that binding review by a designated third party is arbitration even if not denominated as such in the contract) (quoting *General Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.,* 372 U.S. 517, 519, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963))); *see also Wasyl, Inc. v. First Boston Corp.,* 813 F.2d 1579, 1580–82 (9th Cir.1987) (finding an enforceable agreement to arbitrate when the parties had simply agreed that certain disputed issues "shall be established by three independent appraisers"); *Butler Products Co. v. Unistrut Corp.,* 367 F.2d 733, 734–36 (7th Cir.1966) (treating as an arbitration clause contract language providing that "the items in dispute shall be submitted for determination to the firm of Peat, Marwick, Mitchell & Co."); *Mencher v. B. & S. Abeles & Kahn,* 274 A.D. 585, 84 N.Y.S.2d 718, 721 (1st Dep't 1948) (holding that the terms "arbitration" or "arbitrate" need not be used as long as binding review by a third party is clearly "the intention of the parties"); *Meineke v. Twin City Fire*

*Ins. Co.,* 181 Ariz. 576, 892 P.2d 1365, 1369 (Ct.App.1994) (holding that arbitration law is applicable to appraisal provisions in insurance contracts); *Friday v. Trinity Universal of Kansas,* 262 Kan. 347, 939 P.2d 869, 871 (1997) ("We do not see a meaningful distinction between appraisal and arbitration. . . . The end result [of both] is the same. A controversy is settled."); *Aetna Cas. & Sur. Co. v. Insurance Comm'r,* 293 Md. 409, 445 A.2d 14, 20 (1982) (stating that in Maryland, arbitration law has long been applied to appraisal clauses in insurance contracts) [6]; *but see Hartford Lloyd's Ins. Co. v. Teachworth,* 898 F.2d 1058, 1059 (5th Cir.1990) (applying Texas law and holding that an appraisal procedure in an insurance contract is not an agreement to arbitrate under the Federal Arbitration Act); *Southeast Nursing Home, Inc. v. St. Paul Fire and Marine Ins. Co.,* 750 F.2d 1531, 1537–38 (11th Cir.1985) (applying Alabama law and holding that an appraisal procedure is distinct from an arbitration); *Sanitary Farm Dairies v. Gammel,* 195 F.2d 106, 113 (8th Cir.1952) (applying Minnesota law and finding that an appraisal clause is not an arbitration agreement).

Turning to the provision in the lease at issue in this case, and following the methodology set forth in *Meshel* for determining whether the parties have agreed to arbitrate "controversies thereafter arising," we first note that the appraisal provision is one part of a written lease agreement. *See, e.g., Saul Subsidiary II Ltd. P'ship v. Venator Group Specialty, Inc.,* 830 A.2d 854, 861 (D.C.2003); *Capital City Mortg. Corp. v. Habana Vill. Art & Folklore, Inc.,* 747 A.2d 564, 567 (D.C.2000). The appraisal provision in the lease provides that the parties, at designated inter-

---

**6.** Arizona, Kansas, and Maryland have adopted the Uniform Arbitration Act. Thus, because the DCAA "expressly provides that it is to be construed in a manner consistent with the law in other states that have adopted the Uniform Arbitration Act, *see* D.C.Code § 16–4319 (2001), we view the decisions [from these states] as persuasive authority in support of our conclusion." *Meshel,* 869 A.2d at 363.

vals, "shall agree in writing as to the fair market value of the land" for the purpose of adjusting the rent and, "[i]n the event of their failure to so agree, such fair market value *shall* be promptly established by appraisal." (Emphasis added.) The appraisal process is then described, and the lease states that the appraisal "*shall be final and binding* upon the parties hereto as to the fair market value of the said land as aforesaid and shall be the basis of rents to be paid for the period following the adjustment date until the next adjustment date." (Emphasis added).

 Thus, the plain language of the parties' contract indicates exactly what the arbitration act describes: an agreement to submit "controversies thereafter arising" regarding the fair market value of the property to binding resolution by third-party arbitrators with expertise in the field of property appraisal. We see no meaningful distinction between this mechanism for resolving disputes over property value and any other arbitration clause that submits disputes to a non-judicial dispute-resolution process. Arbitration is defined in Black's Law Dictionary as "a method of dispute resolution involving one or more neutral third parties who are usu[ally] agreed to by the disputing parties and whose decision is binding." BLACK'S LAW DICTIONARY at 112 (8th ed. 2004). This precisely describes the parties' agreement to submit controversies over rental value to binding resolution by "disinterested," qualified appraisers. The appraisal here is, in effect, a very particularized type of arbitration. We therefore hold, as a matter of law, that Paragraph 3 of the parties' lease describing the binding appraisal process is an "arbitration agreement" within the meaning of D.C.Code § 16–4301 for purposes of the DCAA.

 The DCAA provides that it "shall only apply to agreements made subsequent to its enactment" in 1977. D.C.Code § 16–4318 (2001). Thus, the landlord asserts, even if the appraisal provision in Paragraph 3 of the lease is an arbitration agreement, it cannot be enforced under the DCAA (and the tenant's motion to confirm under Superior Court Civil Rule 70–I) because the lease, which was last amended in 1968, predates the Act. As the trial court found, however, the parties effectively made a new agreement interpreting the rental adjustment term of the lease in 2003 when they pursued the appraisal process outlined in the lease, and that 2003 agreement—embodied in the February 3, 2003 letter to the appraisers—made the arbitration agreement subject to the DCAA. The letter, which incorporated the lease by reference (stating in the first paragraph that they were proceeding pursuant to Paragraph 3 of lease, which they attached), provided that the appraisal would be "final and binding" and would be used to calculate rents until the next evaluation, to be performed ten years later. Even though the referral to appraisers was required by the pre-existing lease and the letter incorporated by reference the provisions of the lease, entered into before the effective date of the DCAA, the 2003 joint letter was not, as the landlord claims, simply a rote implementation of the lease provisions. Rather, the 2003 letter settled an important and costly issue that is at the core of this litigation—how much of the demised premises is to be used in determining the fair market value of the property—and, in effect, amended the lease with respect to the 2003 adjustment. The letter states that the parties "have mutually agreed" that the language in the lease describing the property to be valued "means" that certain lots, "added to the demised premises by the 1967 Amendment, are not to be included in the rental adjustment calculations for any purpose, and therefore the appraisal should be based on" the lots demised to the tenant

under the original lease, prior to the 1967 amendment. Further highlighting the importance of this interpretation is the fact that the landlord brought arbitration proceedings in Florida because it now claims that the appraisal process should have included the additional land demised to the tenant in the 1967 amendment.[7] The tenant initiated the current suit in an effort to fend off the landlord's attack on the parties' 2003 agreement instructing the appraisers as to which land was to be included in their appraisal. Clearly, both parties believe a lot depends on the validity of the interpretation in the 2003 letter. We agree with the trial court's assessment that the 2003 letter not only implemented the existing agreement to settle their disputes over the fair market value of the land by appraisal, but also resolved yet another ripe controversy over the proper interpretation of the lease provision that defined the basis for the appraisal itself.

Therefore, we hold that the parties' joint February 2003 letter to the appraisers was a new agreement between the parties that amended the lease with respect to the 2003 rent adjustment, and made its appraisal/arbitration provision subject to enforcement under the DCAA. As a consequence, the tenant properly moved under D.C. Superior Court Civil Rule 70–I to confirm the appraisers' decision as an arbitration award. We also conclude that the trial court was correct in confirming the award,

as the landlord did not present a valid basis for vacating it under D.C.Code § 16–4311.[8]

## B. Interpretation of Paragraph 3's Appraisal Provision in Light of Paragraph 21's Arbitration Provision

The second question presented by the landlord is whether, even if Paragraph 3's appraisal is considered an arbitration award subject to the DCAA, the general arbitration clause in Paragraph 21 of the lease permits the landlord to attack the appraiser's process and decision through another arbitration proceeding—in this case, the one which the landlord had commenced in Florida. The trial court, without elaboration, found this argument to be without merit.

 In construing a lease, as any other contract, we must "determin[e] what a reasonable person in the position of the parties would have thought the disputed language meant." *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C.1984). "The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." *Id.* "A court must honor the intentions of the parties as reflected in the settled usage of the terms they accepted in the contract . . . and will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity." *Bragdon v. Twenty–Five Twelve Assocs.*

---

7. As for the landlord's change of heart on this matter, we agree with the trial court that it is "unseemly" for a "party to agree to a reappraisal procedure prescribed in the Lease, as it had done several times earlier, engage appraisers to perform the reappraisal, await the results of the reappraisal, and when the results are not to its liking[,] invoke the Lease's mandatory arbitration provision while at the same time taking the position that the 2003 appraisal is not binding because it is based on a Lease that predates the Arbitration Act. . . . To state the obvious, [the landlord's] positions in this regard are rather inconsistent."

8. The landlord did not assert that the appraisal was procured by corruption, fraud or other undue means, that there was evident partiality or corruption on the part of any of the appraisers, that the appraisers exceeded their powers, or in any other way acted in a manner that would allow invalidation of their decision. *See* D.C.Code § 16–4311(a) (2001); note 2, *supra*. The landlord did assert that the appraisal clause is not an arbitration agreement, *see* D.C.Code § 16–4311(a)(5) (2001), but this claim was rejected by the trial court, as we reject it here.

*Ltd. P'ship,* 856 A.2d 1165, 1170 (D.C.2004) (citations omitted); *accord, Redmond v. State Farm Ins. Co.,* 728 A.2d 1202, 1206 (D.C.1999). Where a contract may reasonably be viewed as having more than one possible meaning, "it is a fundamental rule that in the construction of contracts the court may look not only to the language employed, but to the subject-matter and the surrounding circumstances, and may avail themselves of the same light which the parties possessed when the contract was made." *Independence Mgmt. Co. v. Anderson & Summers, LLC,* 874 A.2d 862, 867 (D.C.2005) (quoting *Merriam v. United States,* 107 U.S. 437, 441, 2 S.Ct. 536, 27 L.Ed. 531(1883)).

▆ The lease provides, in Paragraph 3, that the decision of the appraisers "shall be final and binding," and in Paragraph 21, that "[a]ny controversy or claim arising out of, or relating to this agreement or any breach thereof, shall be settled and adjusted by arbitration in accordance with the rules of the American Arbitration Association, or its successor existing at the time, and judgment upon the award rendered may be entered in any court having jurisdiction thereof." The landlord claims that the "any controversy or claim" language in Paragraph 21 includes a controversy over whether the appraisal was properly performed, whereas the tenant maintains that the language in Paragraph 3 that the appraisal is "final and binding" means it is not subject to further arbitration. We agree that, with respect to appraisals of fair market value, Paragraph 3 trumps Paragraph 21.

▆ A plain reading of the lease, construed to give effect to all of the parties' language and the contract as a whole, dictates that in the appraisal provision the parties intended to set out a particular, final, and binding process to determine fair market value that was separate and apart from the general arbitration provision that governed all other disputes under the lease. In reaching this conclusion, we apply a familiar principle of contract interpretation, that "specific terms and exact terms are given greater weight than general language." RESTATEMENT (SECOND) OF CONTRACTS § 203(c) (1981); *see also GLM P'ship v. Hartford Cas. Ins. Co.,* 753 A.2d 995, 999 (D.C.2000) (a specific contract provision must be given due weight in the context of the contract as a whole); *NOW v. Mut. of Omaha Ins. Co.,* 531 A.2d 274, 279 (D.C.1987) (applying the principle to statutory construction, noting that a "statute should be construed so that general language does not apply to matters covered by more specific language") (*citing Office of People's Counsel v. Public Serv. Comm'n,* 477 A.2d 1079, 1084 (D.C.1984)). The arbitration provision of Paragraph 3 deals with a sole issue—appraisal of property—and refers disputes on that issue to a disinterested panel of experts, qualified property appraisers. Moreover, the parties agreed that the appraisal would be "final and binding," and did not—as they easily could have—make it subject to the arbitration provision in Paragraph 21 of the same document. In light of the clear language of the lease, we conclude that the appraisal resulting from the process delineated in Paragraph 3 of the parties' lease is, as stated, "final and binding," and cannot be subjected to further challenge by invoking the general arbitration provision in Paragraph 21.

### III.

In conclusion, we hold that the appraisal performed in 2003 was a binding arbitration award, and we affirm the judgment of the trial court confirming the award and

staying the arbitration proceeding in Florida.

*Affirmed.*