*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CV-1011

CROWELL & MORING, LLP, APPELLANT,

V.

TREA 1001 PENNSYLVANIA AVENUE TRUST, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2023-CAB-001531)

(Hon. Donald W. Tunnage, Motions Judge)

(Argued December 18, 2025                    Decided January 29, 2026)

*Donald B. Verrilli, Jr.*, with whom *Stephany Reaves*, *Keith J. Harrison*, and *Toni M. Jackson* were on the briefs, for appellant.

*Rebecca Woods*, with whom *Seth J. Fortin* was on the brief, for appellee.

Before BECKWITH, DEAHL, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: This is a contract matter between a commercial tenant and landlord. Appellant Crowell & Moring, LLP, a law firm, leased its office space in downtown D.C. from appellee TREA 1001 Pennsylvania Avenue Trust. In the spring of 2020, when the COVID-19 pandemic and orders issued by the Mayor of the District of Columbia caused Crowell to curtail much of its in-office operations

and direct most of its employees to work remotely, Crowell invoked a rent abatement provision in the parties' lease. The provision entitled Crowell to a rent abatement if, as relevant here, (1) Crowell suffered a "material interference . . . of its use and enjoyment" of the building premises by reason of an interruption of an "Essential Building Service"; (2) the interference rendered all or part of the leased premises "unusable for the purpose of conducting" Crowell's business; and (3) the interference arose from a "Force Majeure . . . event." Crowell's theory was that it suffered a material interference with the use and enjoyment of its office space due to the interruption of the essential building service of "secure access" or "prompt access" into the building and premises, which rendered all or part of its office space unusable for the purpose of conducting Crowell's business and which arose from a force majeure event consisting of an order of government.

After TREA rebuffed Crowell's demand for a rent abatement, Crowell sued for breach of contract in the Superior Court. The parties cross-moved for summary judgment, and the trial court denied Crowell's motion and granted TREA's motion. Crowell has appealed.

We affirm the grant of summary judgment for TREA and the denial of summary judgment for Crowell. The undisputed facts establish that any interference with Crowell's use and enjoyment of its office space was not by reason of an

interruption of Crowell's right to secure or prompt access to the building and premises within the plain meaning of the lease. Thus, as a matter of law, Crowell cannot satisfy the first requirement for rent abatement under the contract and its breach-of-contract claim fails.

## I.    Background

The material facts of this matter, undisputed for purposes of summary judgment, are as follows.

### A.    The Contract Terms

Crowell and TREA's predecessor first entered into a lease in 1985 for space in an office building located at 1001 Pennsylvania Ave., NW. As set forth below, some provisions of that original lease are relevant here, but the primary provision at issue was included in a seventeenth amendment to the lease, executed in 2010.[1]

Subsection 13(f) of the seventeenth lease amendment is the provision at the heart of this case. Section 13 is titled "Utilities." Subsections (a) through (e) of

---

[1] The lease and amendment use the terms "Tenant" for Crowell, "Landlord" for TREA, and "Premises" for the leased office space, and the parties adopt those terms in their briefs. At times we use those terms as well, including where we quote the lease or amendment.

Section 13 pertain generally to TREA's provision of heating, ventilating, and air conditioning (HVAC) and electricity services.

Subsection 13(f) is a rent abatement provision under the Utilities section. It begins by noting that, subject to the other terms of the section,

> Landlord shall not be liable for, and Tenant shall not be entitled to, any damages, abatement or reduction of Rent, or other liability by reason of any failure to furnish any services or utilities described herein (it being understood that Landlord shall use commercially reasonable efforts to keep any disruption of services and utilities to a minimum which shall include payment of any commercially reasonable monetary amount) for any reason (other than Landlord's negligence, willful misconduct, breach of contract or illegal acts), including, without limitation, when caused by accident, breakage, water leakage, flooding, repairs, Alterations or other improvements to the Project, strikes, lockouts or other labor disturbances or labor disputes of any character, government regulation, moratorium or other governmental action, inability to obtain electricity, water or fuel, or any other cause beyond Landlord's control. . . . No such failure, stoppage or interruption of any such utility or service shall be construed as an eviction of Tenant, nor shall the same relieve Tenant from any obligation to perform any covenant or agreement under this Lease except as provided below.

Subsection 13(f) then states:

Notwithstanding any provision of the Lease to the contrary (including without limitation Section 8.05 of the Lease[2]), (1) in the event that Tenant actually suffers a material interference, interruption, curtailment, stoppage or suspension of its use and enjoyment of any portion of the Premises by reason of any interruption of any Essential Building Service (defined below) (collectively, "Interference"), (2) such Interference shall render all or any material part of the Premises unusable for the purpose of conducting Tenant's business in such applicable part of the Premises as permitted under this Lease and (3) either such Interference arises from (I) reasons within the control of Landlord (other than if arising due to the negligence or willful misconduct of Tenant) and such Interference shall continue for more than three (3) consecutive business days after Landlord has been given written notice by Tenant of the Interference, or (II) a Force Majeure (as defined below) event and such Interference shall continue for more than seven (7) consecutive business days after Landlord has been given written notice by Tenant of the Interference, then Annual Rental shall abate in a reasonable and proportional amount . . . .

The subsection states that "Essential Building Services" "shall include HVAC, electrical, elevator and fire and life safety services as well as secure access to the Building (including the requirements set forth in Section 4.02 of the Lease), hot and cold water, plumbing and sewage services." Section 4.02 of the original lease, cross-referenced as part of "secure access," provides, as relevant here, that "Landlord, at its cost and expense, shall . . . provide a Building security system of a

[2] Section 8.05 of the original lease generally precludes rent abatement for failure to provide services and utilities, but, in light of Subsection 13(f)'s "notwithstanding" language, it falls by the wayside if the requirements of Subsection 13(f) are met.

quality equal to other first-class modern office buildings in the District of Columbia" and "provide Tenant, its employees and invitees prompt access (in a manner consistent with a first-class modern office building in the District of Columbia) into the Building (through the lobby) and the Premises twenty-four (24) hours each day, seven (7) days per week."

Subsection 13(f) defines "Force Majeure" as

> any prevention, delay or stoppage due to any Act of God, fire, earthquake, flood, explosion, action of the elements, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure or a general shortage of labor, equipment, facilities, materials or supplies in the open market, failure of transportation, strike, lockout, action of labor unions, a taking by eminent domain, requisition, laws, orders of government or of civil, military or naval authorities, or any other cause similar to the foregoing not within the reasonable control of Landlord.

Two other provisions of the original lease are relevant, as discussed below. Section 2.02 of the lease states that "Tenant shall, during the Term, enjoy the Premises without disturbance from Landlord or any other persons claiming or acting by, through, or under Landlord; subject, however, to the terms of this lease." Article 10 states that "Tenant shall, at its sole expense . . . comply with all laws, orders, ordinances, and regulations relating to Tenant's use of the Premises of Federal, state, county, municipal and other authorities having jurisdiction over the Premises."

## B. The Pandemic and the Mayor's Orders

"Between March 11 and 13, 2020, the World Health Organization ('WHO') declared a global pandemic as a result of the spread of COVID-19. In response, Mayor Muriel Bowser of the District of Columbia declared a public health emergency due to COVID-19 on March 11, 2020." *Rose's 1, LLC v. Erie Ins. Exch.*, 290 A.3d 52, 54 (D.C. 2023) (citation modified).

On March 24, 2020, the Mayor issued an order closing nonessential businesses and prohibiting gatherings of ten or more people. The order provided that all businesses with a facility in the District, except "Essential Businesses," "shall cease all activities at those facilities" except for "Minimum Basic Operations." It defined "Essential Businesses" to include legal services "but only when necessary to assist in compliance with legally mandated activities, Essential Businesses or Essential Governmental Functions." A question-and-answer attachment to the order added that law firm employees "may go to the office if necessary to meet court deadlines." The order's definition of "Minimum Basic Operations" included "[t]he minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences" and "to facilitate teleworking or the remote delivery of services formerly provided in-person by the business." The order stated that "[a]ny individual or entity that knowingly violates" it "shall be

subject to all civil, criminal, and administrative penalties authorized by law . . . ." Also in the order's Q&A attachment was an answer instructing providers of office space to "provide access to offices of your tenants so that they can carry out their own minimum business operations."

A series of additional orders by the Mayor followed over the next fourteen months, varying with respect to precise requirements but generally maintaining a significant curtailment of the in-office operations of, among others, legal service providers. *See id.* at 55 ("As the pandemic continued, to ensure public safety, the Mayor extended the orders closing all non-essential businesses and requiring residents to stay at home."). Notwithstanding variations in how the orders affected in-office operations at different times during the relevant period, there is generally no dispute that (1) Crowell determined which of its services qualified as "essential business," which of its operations qualified as "minimum necessary activities," and how many employees could come to the office at any given time consistent with its reading of the orders and (2) Crowell substantially limited the number of employees who could be present in the office and required most employees to work remotely. It is also undisputed that TREA played no role in those decisions and did not independently impose any limitations on entrance to the premises by any Crowell employees. Prior to the pandemic, Crowell employees had key fob access to the

premises and security guards were present, and these facts were not altered by the Mayor's orders or by TREA.

### C.     The Trial Court Proceedings

Crowell sued TREA for breach of contract after TREA denied Crowell's invocation of Subsection 13(f).  According to the complaint, Crowell paid TREA more than $30 million in rent between March 2020 and May 2021 but should have received a 98% rent abatement due to its inability to use the premises for the normal conduct of its business operations, and it was therefore entitled to a reimbursement of approximately $30 million.  The complaint alleged that "during th[e] relevant time period, there was an interruption of Essential Building Services, including prompt access to the Building, that was due to the COVID-19 Executive Orders, which were a Force Majeure event under the Lease, and that resulted in a 'material interference' of Crowell & Moring's use and enjoyment of the Premises for 'the purpose of conducting Tenant's business as permitted under the Lease.'"

After the trial court denied TREA's motion to dismiss the complaint, the parties cross-moved for summary judgment and the trial court held a hearing over three days.  Crowell's ultimate position at the hearing was that the Mayor's orders were a force majeure event that restricted human movement and thus interrupted secure and prompt access to the building and premises by Crowell employees and

invitees, and that the interruption interfered with the use and enjoyment of the premises and rendered the premises unusable for the purpose of Crowell's business.

At the conclusion of the hearing, the trial court orally granted TREA's motion for summary judgment and denied Crowell's motion for summary judgment. The court began by finding that the contract is unambiguous and noting that both parties agreed as much, although they disagreed on its interpretation.

Regarding the first prong of Subsection 13(f), the court observed that Crowell did not contend, and the undisputed facts did not support, that Crowell's secure or prompt access to the physical premises was ever curtailed or prevented. Rather, Crowell's claim was "that a portion of its workforce was prohibited by the mayor's order from using and enjoying the premises." As to the second prong, similarly, the court stated that Crowell's contention was not that "any material part of the premises, which is a physical plant, was unusable for the purpose of conducting tenant's business"; instead, Crowell's view was that "the entirety of its workforce[ ] was not able to use the premises for the practice of its business." The court found it notable that, if Crowell had determined that it was an essential business, "there would have been no denial of secure and prompt access to the premises in its entirety" because Crowell did "not contend that landlord ever discontinued or interrupted the secure access of the premises." Accordingly, there was no interruption of the essential

building service of secure or prompt access that rendered any part of the premises unusable for conducting Crowell's business.

Regarding the third prong of Subsection 13(f), the trial court read the word "taking" in the definition of "force majeure" as modifying the series of terms that follow it, including "orders of government"; thus, the "taking" clause of the "force majeure" definition refers to a taking by eminent domain, a taking by requisition, a taking by laws, a taking by orders of government, and a taking by orders of civil, military, or naval authorities. An order of government therefore does not, in the trial court's view, qualify as a force majeure event if it did not constitute a taking.

Accordingly, the trial court concluded that there was no set of facts that Crowell would be able to establish to support its claim under the contract. This appeal followed.

## II.     Analysis

Crowell argues that the trial court erred in all three aspects of its summary judgment ruling: that Crowell's secure or prompt access to the premises was not interrupted, that the premises were not unusable for the purpose of conducting Crowell's business, and that the Mayor's orders could not be a force majeure event because they did not constitute a taking of the property. We agree with the trial court

that there was no interruption of the essential building service of secure or prompt access to the building and premises under the plain meaning of the lease and therefore Crowell cannot establish the first requirement for rent abatement. We affirm on that basis without addressing the second and third prongs of Section 13(f).

### A.  Standard of Review

"This court reviews a grant or denial of summary judgment de novo and applies the same standard as the trial court does in considering the motion for summary judgment." *Garner v. Univ. of Texas at Austin*, 317 A.3d 333, 338 (D.C. 2024) (quoting *Bowyer v. Reinhardt*, 277 A.3d 1259, 1265 (D.C. 2022)). "On appeal, this court is required to conduct an independent review of the record to determine whether any relevant factual issues exist by examining and taking into account the pleadings, depositions, and admissions along with any affidavits on file, construing such material in the light most favorable to the party opposing the motion." *Id.* (quoting *Bowyer*, 277 A.3d at 1265). "Summary judgment is proper if, when the facts are viewed in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Bowyer*, 277 A.3d at 1265).

"The proper interpretation of a contract term is a question of law, which we review de novo." *Galvin v. Ruppert Nurseries, Inc.*, 341 A.3d 1165, 1170 (D.C.

2025) (quoting *DCA Capitol Hill LTAC, LLC v. Capitol Hill Grp.*, 332 A.3d 518, 530 (D.C. 2025)).  Whether a contract is ambiguous is also a legal question which we review de novo.  *Tillery v. D.C. Cont. Appeals Bd.*, 912 A.2d 1169, 1176 (D.C. 2006).

## B. Discussion

The parties agree on the issue at the heart of our analysis of the first prong of Subsection 13(f): Taking as a given that Crowell suffered a material interference[3] with its use and enjoyment of its office space due to the Mayor's orders,[4] was that interference by reason of an interruption of the essential building service of "secure access to the Building" or "prompt access . . . into the Building (through the lobby) and the Premises twenty-four (24) hours each day, seven (7) days per week"?

Crowell, moreover, concedes that TREA did not "lock the doors" or prevent Crowell employees from entering the building; its position has been and remains that the denial of access occurred because the Mayor's orders took away Crowell's "permission, liberty, or ability . . . to enter" the building and its freedom to occupy and "make use of" the building.  Crowell asserts that it is entitled to a rent abatement

---

[3] Subsection 13(f) collectively defines "interference, interruption, curtailment, stoppage or suspension" as an "interference," so we use only that term.

[4] TREA conceded such interference at the summary judgment hearing.

because "the [Mayor's] restrictions obviously interrupted Crowell's ability to put the premises to their intended use."[5]

The question, then, boils down to this: Does "secure or prompt access into the building and the premises" as used in the parties' contract mean the physical ability to securely and promptly enter the premises as a matter of infrastructure, utilities, and services that TREA could provide—doors, locks and keys or key cards/fobs, security equipment, security personnel—or a broader notion of permission, liberty, or freedom to occupy and make use of premises untethered to things that TREA as landlord provides?

---

[5] Crowell insists that it is arguing that the Mayor's orders, and not TREA, interrupted its access into the building, but it also refers to an email (a draft, but we will assume for present purposes that it was sent) from the building manager to building tenants. It is not clear whether Crowell is simultaneously suggesting that TREA imposed limitations on Crowell's access to the building, but, regardless, we do not read the email in the manner that Crowell does. The email does ask tenants to comply with the Mayor's order in the interest of safety and well-being, notes that the building will be operating in weekend mode, and states that building management will not be able to "provide individual access to tenants' spaces for third-party vendors or employees." But it states that the building "will remain open to tenants," that security and other services will be provided, and that "[s]o long as tenants permit their essential employees to access the building, these employees can gain access with a valid building I.D./access card." This email does not, under a plain reading, "command Crowell & Moring to limit[ ] its access," as Crowell argued in the trial court. It is also arguable that if TREA had prevented Crowell from accessing the building, it would have violated Section 2.02 of the original lease and run afoul of the answer in the Q&A attachment to the Mayor's March 24 order instructing providers of office space to "provide access to offices of your tenants so that they can carry out their own minimum business operations."

"We construe leases of real property under established principles of contract law." *DCA Capitol Hill LTAC*, 332 A.3d at 530 (citing *2301 M St. Coop. Ass'n v. Chromium LLC*, 209 A.3d 82, 86 (D.C. 2019) (per curiam)). "We first assess the contract's plain language, giving reasonable effect to the contract's parts and avoiding an interpretation that would render any part of it meaningless or incompatible with the contract as a whole." *Id.* (citing *Rose's 1*, 290 A.3d at 60); *see Hto7, LLC v. Elevate, LLC*, 319 A.3d 368, 376 (D.C. 2024) ("We interpret a lease agreement as a whole, giving a reasonable, lawful, and effective meaning to all its terms.") (citation modified). "We analyze disputed terms in light of 'what a reasonable person in the position of the parties would have thought the disputed language meant.'" *DCA Capitol Hill LTAC*, 332 A.3d at 530-31 (quoting *BSA 77 P St. LLC v. Hawkins*, 983 A.2d 988, 993 (D.C. 2009)). "Our endeavor to 'ascertain what a reasonable person in the position of the parties would have thought the words of a contract meant applies whether the language is ambiguous or not.'" *Id.* at 531 (quoting *Akassy v. William Penn Apartments Ltd. P'ship*, 891 A.2d 291, 299 (D.C. 2006)). "A reasonable person 'is: (1) presumed to know all the circumstances surrounding the contract's making; and (2) bound by usages of the terms which either party knows or has reason to know.'" *Id.* (quoting *Akassy*, 891 A.2d at 299).

As an initial matter, we agree with the trial court that "secure access" and "prompt access" are not ambiguous terms. "A document is ambiguous only if 'the

provisions in controversy are reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings.'" *Cap. River Enters., LLC v. Abod*, 301 A.3d 1234, 1239 (D.C. 2023) (quoting *Sahrapour v. LesRon, LLC*, 119 A.3d 704, 708 (D.C. 2015)) (citation modified). A contract is not ambiguous simply because the parties disagree as to how it should be construed or interpreted. *Rose's 1*, 290 A.3d at 62.

We conclude that reading "secure and prompt access to the building and premises" to encompass a generalized right to full occupancy and freedom to use the premises, untethered to services and utilities the landlord provides, is not a reasonable interpretation of the contract. Rather, the plain meaning of the phrase "secure and prompt access" in this commercial lease is the ability of the tenant to physically enter the premises securely and without undue delay by virtue of the types of things that the landlord can provide. We reach this conclusion for five reasons.

First, Subsection 13(f) is part of Section 13 of the seventeenth amendment, which is titled "Utilities" and pertains to items that, in the section's own language, the landlord can "furnish" and "provide" to the tenant. Subsection 13(f) then begins with the baseline that "Landlord shall not be liable for, and Tenant shall not be entitled to, any damages, abatement or reduction of Rent, or other liability by reason of any *failure to furnish any services or utilities described herein . . .* for any

reason . . . ." (emphasis added). It thereafter carves out an exception to that baseline if the tenant actually suffers a material interference of its use and enjoyment of the premises by reason of an interruption of any essential building service, the interference renders the premises unusable for the purpose of conducting the tenant's business, and the interference arises from reasons within the landlord's control or from a force majeure event.

We cannot read the rent abatement provision in isolation; its placement in Section 13 ("Utilities") and specifically under Subsection 13(f)'s baseline regarding nonliability for failure to furnish services or utilities indicates that the exception pertains to services or utilities that the landlord furnishes. *See Washington Auto. Co. v. 1828 L St. Assocs.*, 906 A.2d 869, 879 (D.C. 2006) ("The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms." (quoting *1010 Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d 199, 205 (D.C. 1984))); *Chase v. State Farm Fire & Cas. Co.*, 780 A.2d 1123, 1132 (D.C. 2001) ("The . . . exclusion [in an insurance contract] may appear absolute when read in isolation, but its application may be limited by other provisions which the court, in ruling on a motion for summary judgment with the policy before it, must not ignore."). The most natural reading of Section 13(f) as a whole is that TREA is not liable for the failure to furnish the services and utilities described in the lease; but if TREA fails to furnish a *subset* of those services and utilities—certain essential

building services—Crowell may be entitled to a rent abatement *if* the interruption of the service or utility causes a material interference with Crowell's use and enjoyment of the premises, the interference renders all or part of the premises unusable for the purpose of conducting Crowell's business, and the interference arises from reasons within TREA's control or from a force majeure event.

Second, the other illustrative items listed as "essential building services" in Subsection 13(f)—HVAC, electrical, elevator service, fire and life safety services, hot and cold water, plumbing, and sewage—are all tangible services or utilities that a landlord provides. Principles of contract interpretation militate against reading "secure access" and "prompt access" to mean something so different—something that, in Crowell's words at the summary judgment hearing, the landlord "has nothing to do with." *See District of Columbia v. D.C. Cont. Appeals Bd.*, 263 A.3d 480, 487 (D.C. 2021) (reading contract in a manner that "harmonize[d]" two sections of an article); *cf. In re Wilde*, 68 A.3d 749, 758 n.13 (D.C. 2013) ("Plain meaning is usually ascertained by considering applicable canons of construction, including ordinary meaning, canons of word association such as *noscitur a sociis* and *ejusdem generis*, canons of negative implication such as *inclusio unius*, grammatical rules, and others.").

Third, and relatedly, "prompt access" is included as an essential building service by reference to Section 4.02 of the original lease. That section sets forth things that TREA "shall" do "at its cost and expense," and subsection (v) of Section 4.02 states that TREA shall "provide" Crowell, its employees, and its invitees prompt access into the building and the premises. Reading the phrase "interruption of an Essential Building Service" in Subsection 13(f) together with "provide . . . prompt access" in Section 4.02(v) suggests that what must be interrupted is TREA's *provision* of prompt access.

Fourth, the contract requires not secure and prompt access as a general matter but secure and prompt access *to or into the building and the premises*. Thus, even if "access" can in some circumstances mean the "freedom or ability to obtain or make use of something," we are not interpreting the word "access" standing alone. To understand why this matters, imagine that Crowell employees from a different office were scheduled to conduct a meeting in the D.C. office's conference space but could not travel due to a flight cancellation. At some level, the employees would be correct in saying that they could not "access" the conference space, but if anyone asked them whether they did not use the space because they were denied "secure or prompt access into the building and the premises," surely their answer would be "no." And to put a finer point on it, no one, we think, would find it reasonable for

Crowell to say, "You could not use the space due to a flight cancellation?  That's unacceptable.  We will complain to our landlord about that."

Fifth, the contract explicitly addresses the scenario in which the type of force majeure event at issue here—a governmental edict—affects Crowell's use of the premises without interrupting an essential building service, and it allocates that risk to Crowell.  Article 10 of the original lease says that Crowell "shall, at its sole expense . . . comply with all laws, orders, ordinances, and regulations relating to Tenant's use of the Premises of Federal, state, county, municipal and other authorities having jurisdiction over the Premises . . . ."  Subsection 13(f) says that it applies "[n]otwithstanding any provision of the Lease to the contrary," but we do not read Article 10 as contrary to Subsection 13(f); rather, the provisions are complementary and consistent with the reading we set forth above.  *Cf. Burton v. Off. of Emp. Appeals*, 30 A.3d 789, 796 (D.C. 2011) ("It is well-established that the use of such a 'notwithstanding' clause *clearly* signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of *any other section*.") (emphases in *Burton*) (citation modified).  In the case of a governmental edict that by itself affects Crowell's use of the premises, Crowell bears the cost.  In the case of a governmental edict that gives rise to an interruption of an essential building service and thereby affects Crowell's use of the premises, TREA

bears the cost (if the other requirements of the rent abatement provision are satisfied).

Crowell asserts that because, under the third prong of Subsection 13(f), the interference can arise from a cause not within the reasonable control of TREA, what TREA did or did not do "really doesn't matter." It is true that, under the force majeure provision, an event not within TREA's control can *give rise* to the interference with Crowell's use and enjoyment of the premises by reason of an interruption of an essential building service. There must, however, still be an interruption of an essential building service; under the plain terms of the provision, the force majeure event cannot be sufficient on its own to cause an interference with Crowell's use and enjoyment of the premises. Thus, if a snowstorm knocks out the building's electronic key fob system, preventing access to the building, there would be both an event outside of TREA's control and an interruption of an essential building service that TREA is responsible for providing. If, by contrast, a snowstorm keeps most of Crowell's employees at home, but the building is running and open to anyone who can get to it, there would be an event outside of TREA's control but no interruption of an essential building service. Crowell would deem TREA liable in both cases, meaning that TREA would have warrantied against all sorts of events that it could not possibly control. That is not a reasonable construction of the contract. *Cf. Hto7, LLC*, 319 A.3d at 378 ("While parties are free to contract for

harsh and even bizarre results like that, we should not lightly read such absurdities into a contract when it is just as easy to read it more sensibly.").

The contract language itself underscores this. The initial portion of Subsection 13(f), which generally disclaims landlord liability for failure to furnish services or utilities, notes that a reason for that allocation of risk is that it is "understood that Landlord shall use commercially reasonable efforts to keep any disruption of services and utilities to a minimum which shall include payment of any commercially reasonable monetary amount." The second portion of Subsection 13(f) is an exception to the disclaimer of liability, but it cannot reasonably be read to so substantially shift the allocation of risk. Thus, in the case of the snowstorm that knocks out the key fob system, TREA would have the opportunity to use commercially reasonable efforts, such as bringing in a generator or providing security personnel to let in employees, to mitigate the interruption. In the case of a snowstorm that keeps people off of the streets but does not preclude entry into the building, TREA would have no such opportunity. No reasonable person in the position of the parties—both sophisticated business entities—would think the contractual language puts TREA on the hook in the latter scenario.

In the final analysis, the lease (including its seventeenth amendment) is a standard commercial real estate contract under which a landlord agrees to provide

space and building services in exchange for rent. It is reasonable to expect that if the landlord fails to meet its obligation to provide the space or building services, the tenant may be entitled to a rent abatement. If Crowell had indeed successfully bargained for much more than that—for TREA to take on liability for any and all events outside of its control that interfere with Crowell's freedom and permission to occupy the premises and put them to their intended use—it is not evident to us from the contractual language.

### III.   Conclusion

For the foregoing reasons, we affirm the trial court's order granting appellee TREA's motion for summary judgment and denying appellant Crowell's motion for summary judgment.

*So ordered*.